UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

UNITED STATES OF AMERICA )
)
v. )          Criminal No.: 19-CR-66-RGA
)
NIKOLAOS VASTARDIS, )
EVRIDIKI NAVIGATION, INC., )
LIQUIMAR TANKERS MANAGEMENT )
SERVICES, INC., )
)
Defendants. )

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS INDICTMENT

**COME NOW** Defendants Nikolaos Vastardis ("Defendant Vastardis"), Evridiki

Navigation, Inc. ("Defendant Evridiki Navigation"), and Liquimar Tankers Management, Inc.

("Defendant Liquimar") (hereinafter collectively "Defendants"), by and through their respective

undersigned counsel, and hereby submit this Memorandum of Law in Support of their Joint

Motion to Dismiss Counts One through Four of the Indictment for failure to state an offense

and/or for lack of jurisdiction.  In support thereof, Defendants state as follows:

## PRELIMINARY STATEMENT

This Court should not countenance and should reject the repeated attempts by the United

States government to ignore a comprehensive international enforcement regime predicated on

cooperation by member nations, and replacement with the government's own self-serving

interpretation of the statutes and regulations, in an attempt to exercise jurisdiction and control

over all vessels in the world.  Although the Indictment charges four (4) alleged violations of U.S.

crimes, all charges indisputably stem from alleged conduct and events which occurred on the

high seas, beyond the jurisdiction of the United States. *See* DE16.   Notwithstanding, the

1

government continues to push the boundaries of alleged foreign national and corporate criminal liability for events with only the thinnest connection to the United States.  There is no dispute that the United States has become well-known throughout the world for being disproportionately heavy-handed in targeting foreign owners and managers of foreign-flagged vessels and for holding foreign crew members as hostages for events occurring ***outside*** the jurisdiction of the United States pursuant to the purported authority granted under 33 U.S.C. § 1908(e).  No other country in the world exercises the same punitive and regressive enforcement regime for the alleged conduct which occurred onboard the M/T EVRIDIKI, *i.e.* causing the knowing failure to maintain an accurate Oil Record Book while in U.S. waters (and associated charges).  The present criminal prosecution is ill-advised, ill-conceived, and legally unsustainable. Therefore, the Indictment should be dismissed in its entirety.[1]

## STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

On May 16, 2019, Defendant Vastardis, individually, and  Evridiki Navigation and Liquimar (the "Organizational Defendants") vicariously, were indicted on charges of causing the knowing Failure to Maintain an Accurate Oil Record Book, in violation of 33 U.S.C. §1908(a) and 18 U.S.C. §2 (Count One); Obstruction of Justice, in violation of 18 U.S.C. § §1519 and 18 U.S.C. §2  (Count Two); Obstruction of Justice, in violation of 18 U.S.C. § §1505 and 18 U.S.C. §2  (Count Three); and False Statements, in violation of 18 U.S.C. § §1001 and 18 U.S.C. §2 (Count Four).  *See* DE 16.  On May 30, 2019, each defendant entered pleas of not guilty to all four (4) charges.  *See* DE 20, 21.

---

[1] Counts Two through Four of the Indictment are each premised upon the alleged wrongdoing in Count One.  If Count One is dismissed, there exists no factual or legal basis for the remaining counts of the Indictment.

The *M/T EVRIDIKI* ("*EVRIDIKI*" or "the Vessel") is a 84,796 gross-ton, ocean-going oil tankship.  Evridiki Navigation owns the Vessel and Liquimar, pursuant to a contract, manages the Vessel.  It operates under the supervision of the Liberian government (the "Flag State Administration").[2]  It is well established U.S. law that Flag States have exclusive jurisdiction over their vessels on the high seas.  *See United States v. Vilches-Navarrette*, 413 F. Supp. 2d 60, 70 (D.P.R. Jan 27, 2006) ("it is a fundamental rule of maritime law that ships shall sail under the flag of one State only and, save in exceptional cases…shall be subject to its *exclusive jurisdiction* on the high seas.") (citations omitted); *see also United States v. Hensel*, 699 F.2d 18, 27-28, 1984 AMC 1907 (1st Cir. 1983); UNCLOS, Part XII, Art. 211(2), 217.

Equally important, the Flag Administration, pursuant to the International Convention for the Safety of Life at Sea, is responsible for issuing the Document of Compliance, which certifies that the Safety Management System of a "Company"[3] has been audited and that it complies with the requirements of the International Management Code for the Safe Operation of Ships and for Pollution Prevention ("ISM Code").  The Flag State Administration requires and performs systematic audits to verify compliance with ISM requirements.  If a vessel is non-compliant, the Document of Compliance will be withdrawn, and the vessel is prohibited from trading.[4]

---

[2] The Flag State of a commercial vessel is the sovereignty under whose laws the vessel is registered or licensed and is tasked with certifying a ship's compliance with international standards. *See*, *e.g.*, *United States v. Abrogar*, 459 F.3d 430, 432 (3d Cir. 2006).

[3] *"Company"* means the Owner of the ship or any other organization or person such as the Manager, or the Bareboat Charterer, who has assumed the responsibility for operation of the ship from the Shipowner and who on assuming such responsibility has agreed to take over all the duties and responsibility imposed by the Code.

[4] The U.S. Coast Guard requires "a valid Document of Compliance certificate if you are the

The *EVRIDIKI* arrived in the Port of Wilmington and the Delaware River on or about March 11, 2019.  The U.S. Coast Guard inspected the *EVRIDIKI* the same day, including the Vessel's pollution control equipment.  Under international marine pollution guidelines ("MARPOL"), the international convention designed to eliminate pollution from ships, and the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §1901, *et seq.* (the U.S. law implementing MARPOL), a port state inspection of the pollution control equipment is required to be limited to determining whether the vessel has a proper International Oil Pollution Prevention ("IOPP") certificate, issued by its flag state, in this case Liberia.  The only exception available to this protocol is if, from an inspection or pre-existing information, there is reason to believe that the Vessel does not have the equipment specified in its certificate or has been polluting in the territorial waters of the port state.  The U.S. Coast Guard went far beyond the bounds permitted by MARPOL and APPS in this case.

Without any report of misconduct and no objective reason to suspect a problem, the U.S. Coast Guard directed the Chief Engineer, Defendant Vastardis, to operate the Oily Water Separator ("OWS") and subsequently interviewed him, <u>without the aid of an interpreter</u>, about his operation of the OWS on the high seas prior to entering U.S. waters.  Because the OWS was determined by the Coast Guard to be "dirty," and Defendant Vastardis' (unsuccessful) attempt to communicate in English rather than his native Greek language, the government alleges that the

---

responsible person who, or company which, owns a U.S. vessel engaged on foreign voyages, carrying more than 12 passengers, or is a tanker, bulk freight vessel, freight vessel, or a self-propelled mobile offshore drilling unit of 500 gross tons or more." 33 C.F.R. § 96.330.  The Document of Compliance ensures that the responsible party has completed a valid safety management audit, that the vessel is certified, and that the vessel operates in accordance with the approved Safety Management System. *Id.*

4

OWS must have been operated improperly *outside* the United States, before the Vessel entered U.S. waters.  The government further alleges that entries made in the ORB of machinery space bilge water by Defendant Vastardis (*i.e.* outside the United States) were allegedly false and/or misleading.

## I.  APPLICABLE LAW AND THE LIMITED JURISDICTION OF THE UNITED STATES

### A.  MARPOL 73/78

The International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocol of 1978, sets forth international standards for, *inter alia*, regulating discharges from ocean going vessels.  Together, these two (2) treaties are generally referred to as "MARPOL 73/78" or "MARPOL."  MARPOL prescribes regulations aimed at preventing and minimizing pollution from ships – both accidental pollution and from routine operations. MARPOL includes detailed provisions relating to the cooperation of signatory states and enforcement of MARPOL's provisions as vessels call from port state to port state.  The treaty is not self-executing, so each signatory must enact local laws and regulations to give MARPOL effect.  Notwithstanding, the port state's role in enforcing MARPOL is limited and must be consistent with the historic principles of the law of the sea and to preserve the critical role of the government under whose authority the ship is registered and operates *i.e.* – a vessel's Flag State Administration.

### 1.  The Role of the Flag State Administration

MARPOL makes clear that its requirements will be enforced by the "Administration" and defines "Administration" for each ship as "the Government of the State under whose authority the ship is operating."  MARPOL 73/78, Article 2(5), 12 I.L.M at 1321.  Violations of MARPOL

are subject to the jurisdiction and law of the Flag State wherever the violation occurs, in this case

Liberia. *Id*. at 1322.   Article 6 of MARPOL sets forth the procedures for suspected violations

occurring on the high seas.   Signatories are to cooperate in the detection of such violations

(MARPOL, Article 6(1)), and to report any such suspected violation by a foreign ship occurring

outside the port state party's territorial jurisdiction "to the Administration (*i.e.* the Flag State) so

that appropriate action may be taken (by the flag state) under [MARPOL]."[5] MARPOL, Art. 6,

---

[5] Relevant provisions are found in sections 2 through 5, of MARPOL, which provides as follows:

(2)A ship to which the present Convention applies may, in any port or off-shore terminal of a Party, be subject to inspection by officers appointed or authorized by that Party for the purpose of verifying whether the ship has discharged any harmful substances in violation of the provisions of the Regulations. *If an inspection indicates a violation of the Convention, a report shall be forwarded to the Administration for any appropriate action*.

(3) *Any Party shall furnish to the Administration evidence, if any, that the ship has discharged harmful substances* or effluents containing such substances in violation of the provisions of the Regulations. If it is practicable to do so, the competent authority of the former Party shall notify the master of the ship of the alleged violation.

(4) *Upon receiving such evidence, the Administration so informed shall investigate* the matter, and may request the other Party to furnish further or better evidence of the alleged contravention. If *the Administration* is satisfied that sufficient evidence is available to enable proceedings to be brought in respect of the alleged violation, it *shall cause such proceedings to be taken in accordance with its law* as soon as possible. The *Administration shall promptly inform the Party which has reported the alleged violation, as well as the Organization, of the action taken*.

(5) A Party may also inspect a ship to which the present Convention applies when it enters the ports or off-shore terminals under its jurisdiction, if a request for an investigation is received from any Party together with sufficient evidence that the ship has discharged harmful substances or effluents containing such substances in any place. The report of such investigation shall be sent to the Party requesting it and to the Administration so that the appropriate action may be taken under the present Convention.

12 I.L.M.   Because MARPOL was designed to preserve proper deference to international law and the flag state administration, the treaty expressly provides that "***all possible efforts*** shall be made ***to avoid a ship being unduly detained or delayed*** under Articles 4, 5 or 6 of the present Convention," and that any ship that is so "unduly detained or delayed…shall be entitled to compensation for any loss or damage suffered."   MARPOL, Article 7(2) and (1), 12 I.L.M. at 1312. (emphasis added).

The fundamental principle that the Flag State has exclusive jurisdiction with respect to the conduct of vessels on the high seas, although integral to MARPOL, did not originate with MARPOL.[6]   Rather, under traditional international law, the Flag State has plenary enforcement jurisdiction over offenses committed on board the vessel, regardless where such offenses may occur.   This principle is well-recognized by the Supreme Court of the United States.   For example, in *Lauritzen v. Lauren*, 345 U.S. 571, 73 S. Ct. 921, 97 L. Ed. 1254 (1953), the Supreme Court stated:

> Law of the Flag. – Perhaps the most venerable and universal rule of maritime law…is that which gives cardinal importance to the flag…This Court has said that the law of the flag supersedes the territorial principle, even for purposes of criminal jurisdiction of personnel of a merchant ship, because [the ship] 'is deemed to be a part of the territory of the sovereignty [whose flag it flies], and not to lose that character when in navigable waters within the territorial limits of another sovereignty.'

---

MARPOL, Art. 6, 12 I.L.M. at 1323-1324 (emphasis added).

[6] MARPOL expressly provides nothing in "[it] shall prejudice…the present or future claims and legal views of any State concerning the law of the sea and the nature and extent of coastal and *flag state jurisdiction*" and that the "term 'jurisdiction' in the present Convention shall be construed in light of international law in force at time of application or interpretation of the present Convention."   *See* MARPOL, Art/ 9, 12 I.L.M. at 1326 (emphasis added).

*Id.* at 584-85 (emphasis added) (quoting *United States v. Flores*, 289 U.S. 137, 53 S. Ct. 580, 77 L. Ed. 1086, 155-59 (1933)). Dating back to the time of Chief Justice John Marshall, the Supreme Court has held that "an act of Congress ought ***never*** to be construed to violate the law of nations, if any other possible construction remains . . . ." *Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L. Ed. 208 (1804) (emphasis added).  Simply put, U.S. laws and regulations are limited in their application to the *EVRIDKI*, and the government overstepped its port state authority in this matter by conducting an inspection and investigation that were not warranted and  not referring suspected violation(s) following that inspection/investigation to the Vessel's Flag State Administration, Liberia.

## 2.    The Role of the Port State

Port States[7] are authorized and required to prohibit violations of MARPOL that occur "**within the jurisdiction of [that] Party**." MARPOL, art. 4(2), 12 I.L.M. at 1322 (emphasis added).  In such a case, the Port State may either cause proceedings to be taken in accordance with its laws or refer the matter to the Flag State Administration.  *Id.*   "MARPOL is not a self-executing treaty; instead, each party agrees to 'give effect' to it." *United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 307 (2d Cir. 2009) (citing MARPOL, art. 1(1), 1340 U.N.T.S. at 63, 184); *United States v. Abrogar*, 459 F.3d 430, 434 ("Congress did not make every violation of MARPOL by every person a crime under U.S. law.").[8]  As such, the United States was required

---

[7] When a vessel enters the territorial waters or port of a country, that nation is referred to as the "Port State." MARPOL 73/78, Art. 4(2), 12 I.L.M. at 1322.

[8] Significantly, during the 1973 Convention, "the United States strongly urged a provision whereby port States would have been authorized to prosecute with respect to foreign ships in their ports for violations committed on the high seas," but "this concept was *rejected*" by the Convention. *1973 IMCO Conference on Marine Pollution from Ships: Hearing Before S. Comm.*

to enact legislation or take other action to make the provisions of MARPOL enforceable as a Port

State.  *See Medellín v. Texas*, 552 U.S. 491, 128 S. Ct 1346, 170 L. Ed. 2d 190 (2008).

### B.  THE ACT TO PREVENT POLLUTION FROM SHIPS (APPS)

To implement the substance of MARPOL as domestic law in the United States, Congress

enacted the APPS, 33 U.S.C. §§ 1901-1915. Section 1902 provides that APPS and any

regulations promulgated pursuant to it shall apply to the following:

> (1) to a ship of United States registry or nationality, or one operated under the
> authority of the United States, wherever located; and
>
> (2) with respect to Annexes I[9] and II of the Convention, to a ship, other than a
> ship referred to in paragraph (1), ***while in the navigable waters of the United
> States*** ...

33 U.S.C. § 1902(a) (emphasis added). Congress clearly and unambiguously limited 33 U.S.C.§

1908(a)'s criminalization of MARPOL violations through United States law and Coast Guard

regulations to: (1) U.S. ships, wherever located, and (2) as relevant to this motion to dismiss, to

---

*on Commerce, 93d Cong. 7 (1973)* (statement of Russell E. Train, Administrator, E.P.A.)
(available       at       http://babel.hathitrust.org/cgi/pt?id=mdp.39015076083230;view=1up;seq=10)
(emphasis added) [hereinafter Hearing on 1973 Convention]. As a result, the United States
originally understood the MARPOL Protocol to mean that, "if a ship of another country commits
a violation which [the United States] know[s] about *on the high seas and enters our jurisdiction*,
[the United States] as port State, but non-flag State, *cannot prosecute that vessel* for the violation
outside of our jurisdiction," but must "report it to the flag State." *Id.* at 7 (emphasis added). Thus,
the government's prosecution theory—that it may prosecute the Defendants upon "enter[ing]"
the jurisdiction of the United States for alleged misconduct that occurred at "sea" --was rejected
at the 1973 Convention. The instant Indictment is, therefore, completely contrary to the United
States' original understanding and agreement of the MARPOL Protocol.

[9] MARPOL Annex I, Reg. 17 is the record keeping requirement for the maintenance of an Oil
Record Book and makes it clear that the regulation applies to *inter alia*, "Every oil tanker of 150
gross tonnage and above and every ship of 400 gross tonnage and above other than an oil tanker
shall be provided with an Oil Record Book Part I (Machinery space operations)." *See* Annex I,
Reg. 17(1).

violations occurring on foreign ships *only* while in "the navigable waters of the United States." *Id*.[10]

## C.  UNITED STATES CODE OF FEDERAL REGULATIONS

APPS authorized the U.S. Coast Guard to "prescribe any necessary or desired regulations to carry out the provisions of . . . MARPOL." 33 U.S.C. § 1903(c)(1).   Consistent with MARPOL Annex I, Reg. 17(4), the U.S. regulation found at  33 C.F.R. § 151.25(a) requires that a foreign-flagged vessel (other than an oil tanker) over 400 gross tons, such as the *EVRIDIKI*, "shall maintain an Oil Record Book Part I (Machinery Space Operations)."  *Id*.  The U.S. regulations only apply while the vessel is "**in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States**." 33 C.F.R. § 151.09(a)(5) (emphasis added). The Coast Guard regulations go on to identify the specific types of transfers which require entries to be made into the Oil Record Book (while in U.S. waters). *See* 33 U.S.C. § 151.25(d). The regulations continue at subsection (j) and specifically hold that "[t]he master or other person having charge of a ship required to keep an Oil Record Book shall be responsible for the maintenance of such record." 33 U.S.C. § 151.25(j); *see also United States v. Fafalios*, 817 F.3d 155, 159 (5th Cir. 2016). This record keeping obligation is further limited by § 151.09(a)(5), which makes clear that, as a matter of U.S. law, the obligation only applies while in U.S. waters or at a port or terminal of the United States. *Id*.

---

[10] The Flag State Administration, Liberia, retains exclusive jurisdiction to prosecute any MARPOL violation by the vessel (or its crew) while in international waters. It is well established that the United States' jurisdiction over offenses is generally limited to the territory of the United States, its flagged vessels and/or conduct by its citizens. *Abrogar*, 459 F.3d 430, 436 (3d Cir. 2006); *United States v. Smiley*, 27 F. Cas. 1132 (C.C.N.D. Cal. Sept. 5, 1864).

### D.  THE UNITED STATES LACKS JURISDICTION

The limitations on the United States' jurisdiction in these types of cases were clearly and unambiguously explained by the Third Circuit Court of Appeals in *United States v. Abrogar*:

> [U]nder the APPS and accompanying regulations, Congress and the Coast Guard created criminal liability for foreign vessels and personnel **only for those substantive violations of MARPOL that occur in U.S. ports or waters**. Stated differently, a MARPOL violation by such a vessel or its personnel is only an "offense" under U.S. law if that violation occurs within the boundaries of U.S. waters or within a U.S. port . . . **[N]o provision of the APPS or its accompanying regulations indicates that "failure to maintain an accurate oil record book" by a foreign ship outside U.S. waters is a crime**.    Stated differently, the terms of the Act and its regulations exclude from criminal liability the "failure to maintain an accurate oil record book" by foreign vessels outside U.S. waters.

*Abrogar*, 459 F.3d at 435 (3d Cir., 2006) (emphasis added); *see also United States v. Jho*, 534 F.3d 398, 404 (5th. Cir. 2008) (emphasis added).  The present case presents an issue of first impression,[11] *to wit* -- whether the Indictment impermissibly attempts to include an element in Count One, *i.e.* the knowing failure to "maintain an accurate Oil Record Book," by a Chief Engineer for conduct which occurred outside of U.S. waters and jurisdiction (to the extent it occurred at all). Congress clearly intended (and did) carefully define and limit the criminal prosecutions of alleged violations of MARPOL, as do the Coast Guard regulations implementing APPS; all of which acknowledge MARPOL's deference to international law and the Flag Administrations.  *See* MARPOL '73, Art. 7, 12 I.L.M. at 1312.

---

[11] The question of whether the "knowing failure to maintain an accurate oil record book" was actually a crime for which the Court had jurisdiction was not before the Third Circuit because "Abrogar pleaded guilty to a charge of knowing failure to maintain an oil record book under § 1908(a) and § 151.25." *Id.*, 459 F.3d at 433.

## II.   ARGUMENT

### A.  RULE 12 STANDARD OF REVIEW

Rule 12 of the Federal Rules of Criminal Procedure requires that defendants bring all motions to dismiss defective indictments before trial. *See* Fed. R. Crim. P. 12(b)(3)(B). Challenges to the court's jurisdiction, including claims that the Court lacks subject matter jurisdiction pursuant to Fed. R. Crim P. 12(b)(2), may be brought at any time. *Id*., *see, e.g*., *United States v. Al Hedaithy*, 392 F.3d 580, 586 (3d Cir. 2004).  Both defects are present under the Indictment at issue here, (1) the failure to state an offense, Fed. R. Crim. P. 12(b)(3)(B)(v); and (2) lack of jurisdiction, Fed. R. Crim. P. 12(b)(2), and warrant relief from this Court and the dismissal of the Indictment.

Under Rule 12(b)(3)(B), the District Court may hear a motion alleging a defect in the indictment and a claim that the indictment fails to state an offense.  *See* Fed. R. Crim. P. 12(b)(3)(B) ("The following must be raised before trial: . . . a motion alleging a defect in the indictment . . . but at any time while the case is pending, the court may hear a claim that the indictment . . . fails . . . to state an offense.").  Rule 12(b) allows the consideration at the pretrial stage of any defense "without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  To be legally sufficient, an indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" Fed . R. Crim. P. 7(c)(1)); *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007) (internal citations and quotation marks omitted.)

In order for an indictment to be valid, it must state the elements of the offense and "sufficiently apprise[] the defendant of what he must be prepared to meet."  *Russell v. United*

*States*, 369 U.S. 749, 763, 82 S. Ct. 1038, 8 L. Ed. 2d 240 (1962); *see also United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015). To withstand a motion to dismiss, an indictment must allege that the defendant performed acts that, if proven, would constitute a violation of the law under which the defendant has been charged. *See United States v. Higareda-Ramirez*, 107 F. Supp. 2d 1248, 1251 (D. Haw. July 26, 2000); *United States v. Coia*, 719 F.2d 1120, 1123 (11th Cir. 1983) (stating that "[i]t is . . . mandated, that the district court dismiss an indictment if the indictment fails to allege facts which constitute a prosecutable offense.") *reh'g denied*, 724 F.2d 978, *cert. denied*, 466 U.S. 973, 104 S.Ct. 2349, 80 L.Ed. 2d 822 (1984). An indictment fails to state the elements of the offense if the facts alleged "fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Bergin,* 650 F.3d 257, 264-65 (3d Cir. 2011) (citing *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002)).

An Indictment must also be dismissed where the Court lacks subject matter jurisdiction because it does not relate to an "offense against the laws of the United States." 18 U.S.C. § 3231; *see also United States v. Cogswell*, 637 F. Supp. 295, 296 (N.D. Cal. Nov. 19, 1985). Here, Count One of the Indictment is fatally deficient; without a proper violation of law under Count One, there simply exists no factual basis for the violations alleged in Counts Two, Three, and Four.

**B.  COUNT ONE OF THE INDICTMENT MUST BE DISMISSED**

A district court is "required to dismiss [any count of an] indictment [that] fails to allege facts that constitute a prosecutable offense." *United States v. Cure*, 804 F.2d 625, 627 (11th Cir. 1986) (*per curiam*); *United States v. Bergin*, 650 F.3d 257, 264 (3d Cir. 2011); *see also United States v. Boffa*, 513 F. Supp. 444, 467 (D. Del. Dec. 12, 1980) ("[The] Court's task is not to

13

determine whether the Indictment could have been more artfully or exactly written, but solely to insure that the constitutional notice requirements imposed by the Fifth and Sixth Amendments have been fulfilled"). In other words, because "[t]he sufficiency of a criminal indictment is determined from its face," *United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. 2004), a motion to dismiss is appropriate for testing whether the facts, as alleged, would constitute a crime. *See, e.g., United States v. Kaluz*a, 780 F.3d 647, 664 (5th Cir. 2015) (affirming the dismissal of certain counts of the indictment because the "Defendants do not fall within the meaning of the statute"); *see also United States v. Carlisle*, 693 F.2d 322, 324 (4th Cir. 1982) (per curiam) (holding that the indictment should have been dismissed because "check-kiting is not an offense within the terms of [18 U.S.C.] § 1014")

Count One charges that it is a crime to "knowingly fail and cause the failure to maintain an accurate Oil Record Book" and alleges that *EVRIDIKI*'s Oil Record Book was inaccurate because the Defendants "falsely recorded and caused to be recorded that discharges of machinery space bilge water had been made through a properly functioning Oily Water Separator."  DE 16 (citing 33 U.S.C. § 1908(a)).  Significantly, all relevant engine room operations and record keeping obligations, as the government well knows, occurred on the high seas -- not within the navigable waters of the United States.  No U.S. law or regulation requires a foreign vessel to maintain an Oil Record Book at any time other than while it is in the navigable waters of the United States (or at a port or terminal of the United States).  *See* 33 C.F.R. § 151.09.  In addition, <u>no</u> U.S. law requires a knowingly *accurate* ORB of a foreign-flagged vessel, only that the ORB be maintained by the Master (or other person in charge of the Vessel) while in U.S. waters. *Id.*, *see also* 33 C.F.R. § 151.25(j); 33 U.S.C. § 1908(a).    Accordingly, Count One fails to charge

"an offense against the laws of the United States." *See* 18 U.S.C. § 3231.   The sections of MARPOL, APPS, and the regulations cited above make clear that a port state has jurisdiction over only those violations which occur "***within the jurisdiction of [the Port State]***."   *See* MARPOL 73/78, Art. 4(1), 12 I.M.L. at 1322; APPS 33 U.S.C. § 1902; 33 C.F.R. 151.09; *see also United States v Abrogar*, 459 F.3d 430 (3d Cir. 2006).

### 1.    *Abrogar* Confirms that there is No U.S. Offense or Jurisdiction

The government argues that the word "maintain" as it is used in the regulation, is intended to confer on the government the purported authority to enforce MARPOL on a worldwide basis, or at least against any foreign-flagged vessel and crew that happen to enter any U.S. port.  This interpretation of MARPOL is wrong.  The Third Circuit's decision in *United States v. Abrogar* is instructive.  *Id.*  There, the Third Circuit held that

> A MARPOL violation by [a foreign] vessel or its personnel is only an 'offense' under U.S. law if that violation occurs within the boundaries of U.S. waters or within a U.S. port.. . .The United States [thus] has no jurisdiction to prosecute a foreign vessel or its personnel for 'failure to maintain an accurate oil record book' outside of U.S. waters. . . Stated differently, the terms of the Act and its regulations exclude from criminal liability the 'failure to maintain an accurate oil record book' by foreign vessels outside U.S. waters.

*Abrogar*, 459 F.3d at 435.

In *Abrogar*, the chief engineer voluntarily agreed to plead guilty to the charge of "failing to maintain an accurate oil record book as required by 33 C.F.R. §151.25, in violation of 33 U.S.C. §1908(a)."  *Id.* at 433.  The only issue on appeal was whether pollution events occurring on the high seas were relevant conduct that could be taken into account in fashioning Abrogar's sentence.  *Id.* at 431.  The United States Court of Appeals for the Third Circuit concluded that the acts conducted on the high seas ***was not conduct*** which could be considered under the

sentencing guidelines, and the Third Circuit vacated Abrogar's sentence and remanded the case for resentencing. *Id*. at 437.

As Abrogar had pleaded guilty, the court was not called upon to determine whether the alleged failure to "maintain an accurate" Oil Record Book is a crime at all – especially if the events inaccurately or insufficiently recorded, occurred *only* outside the United States. Notwithstanding, *Abrogar* provides critical guideposts for this Court's review of the alleged offense in this matter.  If the actions of chief engineer in *Abrogar* was not conduct which could be reviewed for the purposes of imposing a sentence under the admittedly more relaxed standard of 'relevant conduct'[12] used for sentencing, it certainly cannot be the basis for a criminal violation in this case.  Significantly, though, the court explained that:

> APPS provisions and regulations cited above do not merely implicate jurisdiction. They are worded in such a way as to define, for purposes of U.S. law, the scope within which MARPOL violations constitute crimes at all, irrespective of implications for jurisdiction proper.

*Abrogar*, 459 F.3d at 435 n. 3.

Here, Defendants respectfully submit, that mere possession of an alleged inaccurate or incomplete ORB within the United States (or the failure to maintain an accurate ORB) is not a crime against the United State for the following reasons:

1. No form of the word "accurate" appears in the APPS statute or the MARPOL treaty from which it was taken;

---

[12] "Relevant conduct" is "the range of conduct that is relevant to determining the applicable offense level" under the Guidelines Manual.  *See* § 1B1.3 comment. (backg'd.). Section 1B1.3 of the Guidelines Manual defines relevant conduct and explains the rules for determining what acts or omissions are considered relevant conduct to a given offense type.  Specifically, in every case, relevant conduct includes "actions of the defendant performed **in preparation for the offense, during the offense, and following the offense to avoid detection**." Section 1B1.3(a)(1)(emphasis added).

2.  Section 151.09 of the Code of Federal Regulations makes clear that the United States requires entries in a foreign ship's ORB only "while in the navigable waters of the United States" or at a "port or terminal of the United States." *Id*.  It would make no sense to specify that entries are required only for events that occur in our country and yet prosecute foreigners for failing to make an entry for an event that occurred thousands of miles away and months before arrival, based on a reference to records being "maintained" while in this country; yet the government is bringing just such a charge against these Defendants.

3.  Although the Coast Guard regulations implementing APPS employ the word "maintain", the word is most commonly understood to mean "to keep or preserve." The government's theory, on the other hand, is that although the U.S. law requires no entries (accurate or otherwise) in the ORB at the time of high seas events, section 151.25 is intended to require a ship's captain, upon entering the United States, to go back and add or correct entries for events occurring outside the United States.   Such is an uncommon interpretation of the word "maintain" and one at odds with the regulations' use of the word.  The regulations expressly provide that a Master (i.e. – the Captain) is responsible for the maintenance of the book only "while in the navigable waters of the United States."   33 C.F.R. § 151.25(j) and 33 C.F.R. 151.09(a); *see also United States v. Fafalios*, 817 F.3d 155, 159 (5th Cir. 2016) (citing *Thompson v. Goetzmann*, 337 F.3d 489, 499 (5th Cir. 2003) (invoking the "well-known interpretative canon, *expressio unius est exclusio alterius*—'the expression of one thing implies the exclusion of another'")). Moreover, while the Master is "responsible for the maintenance" of the book in this country, there is no express or implied requirement that he determine the accuracy of individual entries, even entries made in this country. *Id*. The individuals completing the operations (in this country) are required to make entries. 33 C.F.R.§ 151.25(h).  The Master's job (while in this country), in addition to being responsible for the "maintenance of the" ORB, is merely to "sign" "each completed page."  33 C.F.R. § 151.25(j).

4.  Although the APPS regulations employ the word "maintain," the MARPOL regulations themselves do not employ the term.  Instead, those regulations state that the vessel "shall be provided with" (rather than "maintain") an ORB and that the ORB shall be "kept" in an accessible place. MARPOL Reg. 17, *supra*.

5.  Read as a whole, MARPOL and APPS make clear they require international cooperation and port-state enforcement of high seas violations – not a system whereby any port state can take over worldwide enforcement by the mere expediency of claiming foreigners' records concerning foreign events are inaccurate.

6.  The government's bizarre interpretation violates the rule of lenity.  *See, e.g., Yates v. United States*, 135 S. Ct. 1074, 1079-80 (2015)(applying rule of lenity to conclude that fish are not a "tangible object" within the meaning of 18 U.S.C. §1519, prohibiting obstruction of justice by "destroying" tangible objects with the intent to impede an investigation); *United States v. Diaz*, 592 F.3d 467, 474 (3d Cir. 2010)(applying rule of

lenity in construing firearm enhancement and application of consecutive sentence provision regarding multiple violations of 18 U.S.C. §924(c)).

7.  The government's interpretation violates the "presumption against extraterritoriality" by which "absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."  *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2100 (2016).  Far from "clearly expressing" an intent that the United States should seek to enforce MARPOL on a worldwide basis, Congress made clear in APPS that violations of MARPOL, APPS and the regulations under APPS are criminalized only if they occur in the United States.  Thereafter, the Coast Guard changed the words of "shall be provided an oil record book" as specified in MARPOL Regulation 17 to the words "shall maintain an oil record book" in the Code of Federal Regulations – and added a provision that the Master "shall be responsible for the maintenance" of the ORB.  But the regulations repeated that those (and all) provisions apply to foreign ships only "while in the navigable waters of the United States."  So, fairly read, they do not suggest an inaccurate or incomplete entry made on the high seas by a foreigner in a foreign vessel's ORB becomes a crime against the United States whenever the vessel enters U.S. water.  In the charging documents – but not in any law or regulation – DOJ - Environmental Crime Section lawyers then added the word "accurate" in the middle of the phrase "maintain an ORB" in an effort to assert jurisdiction over events suspected of occurring on the high seas.   This is not the "clear" expression of "***congressional intent***" required to exercise U.S. criminal jurisdiction over foreigners for foreign events.

8.  The provisions of MARPOL and APPS discussed at length herein make clear the treaty and statute were not intended to – and do not – allow for this assertion of criminal jurisdiction over foreign nationals for suspected high seas events.

## 2.  <u>Cases Regularly Cited by the Government are Inapposite</u>

It is anticipated that the government will rely on, *inter alia*, the United States Court of Appeals for the Second Circuit decision in *United States v. Ionia Mgmt. S.A.*, 555 F.3d 303 (2d Cir. 2009) and the United States Court of Appeals for the Fifth Circuit decision in  *United States v Jho*, 534 F.3d 398 (5th Cir. 2008), for the proposition that Count One in the Indictment for the 'knowing failure to maintain an accurate Oil Record Book while in United States waters' under 33 U.S.C. § 1908(a) has been resolved by two (2) Circuit Courts in favor of the government's right to prosecute alleged violations of MARPOL/APPS, even when occurring in international waters.  *See e.g. Jho*, 534 F.3d at 401-02 ("[W]e read the requirement that an oil record book be

"maintained" as imposing a duty upon a foreign-flagged vessel to ensure that its oil record book is accurate (or at least not knowingly inaccurate) upon entering the ports of navigable waters of the United States."); *Ionia Mgmt. S.A.*, *supra* (adopting same).[13]

Both of these cases improperly read into the statute and regulations an obligation (*i.e.* that the ORB be "knowingly accurate" or at least not "knowingly inaccurate") which does not exist. Both of those cases were also decided <u>before</u> *United States v. Fafalios* and under a (mis)belief that a Chief Engineer could be principally charged and convicted for the failure to maintain an Oil Record Book. *See, e.g. Jho*, 534 F.3d at 404. The Fifth Circuit Court of Appeals made clear in the *Fafalios* that the legal obligation falls squarely (and exclusively) on the Master or other person in charge of the vessel. *See United States v. Fafalios*, 817 F.3d 155, 159 (5th Cir. 2016). A Chief Engineer is neither.

The United States Court of Appeals for the Third Circuit made clear in *Abrogar* that APPS and the accompanying regulations were limited in scope and applicability to only offenses which occurred within the jurisdiction of the United States, and not in international waters. The limits of APPS and the accompanying regulations were explained by the Third Circuit, as follows:

---

[13] The Second and Fifth Circuits did not fully consider the limitations of MARPOL and APPS when they held that 33 C.F.R. § 151.25(a) imposes an ongoing "duty upon a foreign-flagged vessel to ensure that its oil record book is accurate (or at least not knowingly inaccurate) upon entering the ports of navigable waters of the United States." *Jho*, 534 F.3d at 403; *accord Ionia Mgmt.*, 555 F.3d at 308 (quoting the same). Instead, they reasoned that such an interpretation is necessary to preserve "the government's ability to enforce MARPOL's requirements." *Jho*, 534 F.3d at 403; *see also Ionia Mgmt.*, 555 F.3d at 308 (similar). But this understanding gets the obligation backwards. If "a ship of another country commits a violation which [the United States] know[s] about on the high seas and enters our jurisdiction, [the United States] . . . cannot prosecute that vessel for the violation outside of our jurisdiction." Hearing on 1973 Convention, *supra*, at 7 (emphasis added); *see also* 33 U.S.C. § 1902(a)(2), (3).

the United States has *no jurisdiction* to prosecute a foreign vessel or its personnel for "failure to maintain an accurate oil record book" outside of U.S. waters. Furthermore, *no provision of the APPS or its accompanying regulations indicates that "failure to maintain an accurate oil record book" by a foreign ship outside U.S. waters is a crime*. Stated differently, the terms of the Act and its regulations exclude from criminal liability the "failure to maintain an accurate oil record book" by foreign vessels outside U.S. waters.

*United States v. Abrogar*, 459 F.3d 430, 435 (emphasis added).

The Third Circuit was adamant that these legal distinctions were of particular significance. As highlighted by the Third Circuit, "The APPS provisions and regulations cited above do not merely implicate jurisdiction. They are worded in such a way as to define, for purposes of U.S. law, the scope within which MARPOL violations *constitute crimes at all*, irrespective of implications for jurisdiction proper." *Id.* at 435 n. 3. (emphasis added). To find otherwise would violate the presumption against continuing offenses, the presumption against the extraterritorial application of law, and the rule of lenity. There is no indication that the Second and Fifth Circuits even considered these established canons of interpretation. *See United States v Jho*, 534 F.3d 398, 403-04 (5th Cir. 2008); *see also United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 307-09 (2d Cir. 2009).

Justice Marshall in *Boston & Me. R.R.* explained the historic roots of the limits on criminal prosecution, stating that "the fact that a particular activity may be within the same general classification and policy of those covered does not necessarily bring it within the ambit of the criminal prohibition." *United States v. Boston & Me. R.R.*, 380 U.S. 157, 160, 13 L. Ed. 2d 728, 85 S. Ct. 868 (1965) ("The rule that penal laws are to be construed strictly, is, perhaps, not much less old than construction itself. *It is founded on the tenderness of the law for the rights of individuals*; and on the plain principal that the power of punishment is vested in the

20

legislative, not in the judicial department.")(emphasis added).  Said another way, where as here, the statute and regulations do not constitute a violation of U.S. law, the government and Court may not substitute in missing qualifiers not imposed by Congress.  Accordingly, Count One must be dismissed as a matter of law as there has been no offense against the United States because the Defendants did not, and could not, knowingly "fail and cause the failure to maintain an accurate Oil Record Book for the M/T EVRIDIKI" while in U.S. waters.

### C. COUNTS TWO, THREE, AND FOUR OF THE INDICTMENT MUST BE DISMISSED.

Counts Two and Three of the Indictment charge an Obstruction of Justice for the Defendants' intent to "impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of  . . . the U.S. Coast Guard and the Department of Homeland Security, . . . namely, an inspection of the M/T EVRIDIKI to determine the vessel's compliance with U.S. law" by knowingly making false entries in the Oil Record Book (Count Two), and having the ship's Master present the Coast Guard with an ORB that "falsely reported that required pollution prevention equipment had been properly used when discharging bilge water," and by "tricking" the "system into reporting an oil content of less than 15 ppm," and falsely stating that the sample line valve was open during "at-sea operations." (Count Three).  DE 16.  Count Four charges a False Statement for the Defendants statement to the Coast Guard that when the vessel's OWS was "run at sea during normal operations, the valve to the sample line to the Oil Content Meter was fully open, when in fact it was not."  *Id*.

Each of these Counts alleges an action that occurred "at sea" during "at-sea operations." *A foriori*, these alleged offenses did not occur within the jurisdiction of the United States. As explained above, there is a longstanding presumption that, when Congress legislates, the law

21

applies "only within the territorial jurisdiction of the United States." *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991); *accord Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255, 130 S. Ct. 2869, 2877, 177 L. Ed. 2d 535 (2010). To overcome this presumption, Congress must "*clearly express[]*" an "affirmative intention" to the contrary. *Arabian Am. Oil*, 499 U.S. at 248 (emphasis added). This is particularly true with respect to a criminal statute. *Cf. Arthur Andersen LLP v. United States*, 544 U.S. 696, 703, 125 S. Ct. 2129, 161 L. Ed. 2d 1008 (2005) ("We have traditionally exercised restraint in assessing the reach of a federal criminal statute . . . .").

The relevant obstruction statutes at issue here—18 U.S.C. §§ 1505 and 1519— and do not contain such a clear expression of extraterritorial application. There is no hint, let alone an affirmative expression, in the text or legislative history that Congress intended any of these statutes to reach conduct committed by foreign citizens outside the territorial jurisdiction of the United States. These statutes therefore do not have extraterritorial application.  The Supreme Court's decision in *United States v. Bowman*, 260 U.S. 94 (1922), established a limited exception to the presumption against extraterritorial application where Congress's intent could be *inferred* from the circumstances, including from the nature of the offense. *United States v. Plummer*, 221 F.3d 1298, 1304 (11th Cir. 2000) ("*Bowman* established the rule that Congress need not expressly provide for the extraterritorial application of a criminal statute if the nature of the offense is such that it may be inferred.").

*Bowman* does not compel a different result here, as no such inference is present. In *Bowman*, the Court explained that the extraterritorial application of some statutes—directed at preventing "obstruction, or fraud"—can "be inferred from the nature of the offense." *Bowman*, 260 U.S. at 98. It then listed examples where such statutes were directed at events that would

22

necessarily occur abroad or on the high seas, such as a statute penalizing a "consul [who] knowingly certifies a false invoice" or a statute specifically directed at "[f]orging or altering ship's papers." *Id.* at 99. The Supreme Court acknowledged that the crime before it—knowingly presenting a false claim to a "corporation in which the United States is a stockholder"—was missing these hallmarks. *Id.* at 101. But the Court inferred an extraterritorial intent because, when Congress amended the general fraud statute to include a fraud committed against "a corporation in which the United States owns stock," it "intended to protect the Emergency Fleet Corporation," a federally-held company that "was expected to engage in, and did engage in, a most extensive ocean transportation business, and its ships were seen in every great port of the world." *Id.* at 101-02. Thus, the Court found evidence of a specific intent to apply the general fraud statute at issue there to extraterritorial conduct. *See id.* As set forth below, there is no such inferred intent in the statutes relied upon by the government in support the remaining counts in the Indictment.

### 1. The Obstruction Counts Two and Three Do Not Apply Extraterritorially and Must Be Dismissed.

The same specific intent is missing with respect to the two (2) obstruction statutes charged in Counts Two and Three here. Indeed, when Congress intends for a general obstruction statute to have extraterritorial application, it makes that intent clear. For example, 18 U.S.C. §§ 1512 and 1513 contain affirmative extraterritoriality provisions. 18 U.S.C. § 1512(h) ("There is extraterritorial Federal jurisdiction over an offense under this section."); *id.* § 1513(d) (same). These provisions were added to the criminal code in 1982, *see* Victim and Witness Protection Act of 1982, Pub. L. No. 97-291, § 4(a), 96 Stat 1248, 1250, and yet, Congress did not see fit to amend 18 U.S.C. § 1505 to include a similar provision, nor did it do so when it added 18 U.S.C.

§ 1519 to the criminal code in 2002, *see* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, tit. VIII, § 802(a), 116 Stat. 745, 800.

In short, Congress plainly expressed its intent that only certain obstruction statutes were meant to have extraterritorial effect; but not for 18 U.S.C. §§ 1505 and 1519.  Accordingly, these statutes do not have extraterritorial effect. *See Carnero v. Boston Scientific Corp.*, 433 F.3d 1, 8 (1st Cir. 2006) (holding that 18 U.S.C. § 1519 does not apply extraterritorially because "Congress has provided expressly elsewhere in the Sarbanes-Oxley Act for extraterritorial enforcement of a different, criminal, whistleblower statute"); *see also United States v. Gabriel*, 920 F. Supp. 498, 501 (S.D.N.Y. 1996) (Rakoff, J.) (noting that Congress had expressly provided for extraterritorial application of 18 U.S.C. § 1512, in contrast to "other vaguer obstruction statutes like [18 U.S.C.] § 1503").  For example, the charge brought under Section 1519 in Count Two alleges that the Defendants impeded and/or obstructed the Coast Guard's inspection of the *EVRIDIKI* because the ORB "contained entries indicating that the required pollution prevention equipment had been properly used when discharging bilge water [at sea], when it had not."  DE 16.  As such, Count Two must be dismissed in its entirety for the failure to state a U.S. crime.

Likewise, the charge brought under Section 1505 in Count Three also turns on allegations that the Defendants made false entries in the Oil Record Books *while on the high seas*—not within the territorial jurisdiction of the United States.  Thus, this charge also fails to state an offense under U.S. law.  Under controlling Third Circuit precedent, and the plain language of the relevant regulations, the alleged events and documents concerning the events are beyond U.S. jurisdiction and implicate only Liberian law.  *United States v. Abrogar*, 459 F.3d 430, 435 (3d Cir. 2006). The United States may not, by the practice of developing and operating the law

enforcement scheme outlined above, create worldwide jurisdiction over events by which foreigners violate (or comply with) only foreign law.

### 2.      Count Four Charging an Alleged Violation of 18 U.S.C. 1001 Must also be Dismissed

The charge under 18 U.S.C. § 1001 must also fail as a matter of law as there was no underlying offense against the United States for the alleged conduct on the high seas.   An examination of § 1001 reveals that it encompasses two distinct offenses: concealment of a material fact, and false representation of a material fact. *United States v. Diogo*, 320 F.2d 898, 902 (2d Cir. 1963).   Count Four alleges the second offense, false representation of a material fact. But in prosecuting a § 1001 false representation violation, it is incumbent upon the government to prove that the defendant had a legal duty to disclose the material facts at the time he was alleged to have concealed and/or misrepresented them. *United States v. Irwin*, 654 F.2d 671, 678-79 (10th Cir. 1981), *cert. denied*, 455 U.S. 1016, 72 L. Ed. 2d 133, 102 S. Ct. 1709 (1982). As no such duty existed on behalf of Defendant Vastardis, and Counts One through Three are not crimes giving rise to U.S. jurisdiction, there can be no violation of 18 U.S.C. § 1001. See *United States v. Muntain*, 198 U.S. App. D.C. 22, 610 F.2d 964, 971-972 (D.C. Cir. 1979); *United States v. Ivey*, 322 F.2d 523, 524-526 (4th Cir. 1963), cert. denied, 375 U.S. 953, 84 S. Ct. 444, 11 L. Ed. 2d 313 (1963); *United States v. Phillips*, 600 F.2d 535, 536-37 (5th Cir. 1979).

### 3.      The Aiding and Abetting Charge pursuant to 18 U.S.C. § 2 Does Not Cure the Indictment

The 18 U.S.C. § 2 allegations in all four (4) counts must also fail since Defendants did not aid, abet or cause anyone to commit an offense against the United States. *See, e.g.*, *Abrogar,*

*supra*. Each of the Counts of the Indictment charges Aiding and Abetting under 18 U.S.C §2. *See* DE 16.   The Indictment's use of the word "cause" suggests that the government intends to rely upon §2(b) of this statute, but the Indictment fails to charge "willful" causation, an essential element of liability under §2(b).   Additionally,   Count One defectively charges that the Defendants "did knowingly . . . cause the failure to maintain an accurate Oil Record Book," whereas the elements of this particular offense (which is not actually a crime under U.S. law) requires a "knowing  failure" -- not merely a "knowing causation of a failure."  *Id*.  Accordingly, any reliance on 18 U.S.C. §2 to clear the 'jurisdictional limitations' of the alleged offenses which have been charged in the Indictment is insufficient to overcome Defendants' motion and the Indictment must be dismissed in its entirety.

### D.  DUE PROCESS WARRANTS DISMISSAL

Where, as here, there has been no actual U.S. offense committed under APPS and the implementing regulations, traditional notions of due process preclude prosecution in this case. It is unconstitutional to prosecute a defendant for conduct when there is no notice that the conduct is subject to criminal sanctions.  *See United States v. Lanier*, 520 U.S. 259, 264-65, 117 S.Ct. 1219, 1224-25, 137 L. Ed. 2d 432 (1997).  It has long been settled that penal statutes are to be construed strictly, and that one is not to be subjected to a penalty unless the words of the statute plainly impose it. *United States v. Campos-Serran*o, 404 U.S. 293, 297, 92 S. Ct. 471, 30 L. Ed. 457 (1971).  *United States v. Hussein*, 351 F.3d 9, 14 (1st Cir. 2003); *see also United States v. Nason*, 269 F.3d 10, 22 (1st Cir. 2001). "The Supreme Court has also held that 'due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. [T]he touchstone is

whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *DeGennaro v. Maine*, No. 2:15-cv-00381-GZS, 2016 U.S. Dist. LEXIS 58445, at *11 (D. Me. May 3, 2016) (*citing Lanier*, *supra*).  This Court should not countenance the government's overbroad misinterpretation of APPS and the accompanying regulations and Counts One through Four should be dismissed as a matter of due process.

## **CONCLUSION**

**WHEREFORE**, for the foregoing reasons, Defendants respectfully requests that this Court dismiss the instant Indictment against Defendants Nikolaos Vastardis, Evridiki Navigation, Inc., and Liquimar Tankers Management Inc. in its entirety and grant such other relief that this Court deems just and proper.

Dated at Portland, Maine this 1st day of July, 2019.

/s/ Bruce M. Merrill
Bruce M. Merrill
BRUCE M. MERRILL, P.A.
225 Commercial Street
Suite 501
Portland, Maine 04101
Tel.: (207)775-3333
Fax: (207)775-2166
E-mail: mainelaw@maine.rr.com

*Attorney for the Defendant,*
*Nikolaos Vastardis*

Dated at Oyster Bay, New York this 1st day of July, 2019.

/s/ George M. Chalos
George M. Chalos, Esq.
Briton P. Sparkman, Esq.
Melissa D. Russo, Esq.

27

CHALOS & Co., P.C.
55 Hamilton Ave.
Oyster Bay, New York 11771
Tel.: (516)714-4300
Fax: (516)750-9051
E-mail: gmc@chaloslaw.com
           bsparkman@chaloslaw.com
           mrusso@chaloslaw.com

*Attorneys for the Defendants*
*Evridiki Navigation, Inc., and*
*Liquimar Tankers Management, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of July, 2019, I electronically filed the attached

*Memorandum of Law in Support of Motion to Dismiss Indictment* on behalf of the above-named

Defendants, with the Clerk of Court, using the CM/ECF system, which will send notification of

such filings to all counsel of record.

<u>/s/ Bruce M. Merrill</u>
Bruce M. Merrill, P.A.