## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Case No. 19-66-RGA** |
| **v.** | ) | |
| | ) | **GOVERNMENT'S SUPPLEMENTAL** |
| **NIKOLAOS VASTARDIS,** | ) | **MEMORANDUM IN AID OF** |
| | ) | **SENTENCING** |
| **Defendant.** | ) | |

### Introduction

The United States, by and through undersigned counsel, respectfully submits this supplemental memorandum in aid of sentencing.

The Court has determined that the applicable final offense level is 14 in Zone D. The Court's Memorandum Order dated April 20, 2020 [Doc. 169] addressed and resolved various sentencing issues. Defendant agrees with the Court's calculation, but asserts that probation is the appropriate sentence for defendant's conviction on four felonies, asserts that a guideline sentence would work an unwarranted sentencing disparity, and that the COVID-19 global pandemic further supports his request for a variance.

As set forth below, the United States maintains that a guideline sentence is necessary and appropriate in order to fulfill the sentencing considerations in the U.S. Sentencing Guidelines and Title 18, U.S.C. § 3553.

### Statutory Sentencing Considerations: 18 U.S.C. § 3553

Defendant was charged and convicted with four serious offenses. By framing his conduct as mere recordkeeping offenses, Defendant continues to minimize the seriousness of his criminal conduct. In fact, Defendant engaged in ongoing and multiple acts of pollution over an extended

period of time.[1] In each case, he tricked required pollution prevention equipment and violated a well-known and universal system designed to protect the environment. Defendant Vastardis then made numerous false statements by omission and commission in the Oil Record Books (ORBs) to cover up the misconduct and ensure that the vessel's business would not be disrupted. Defendant knew that his vessel would be inspected in the U.S. and various foreign ports. He planned in advance to obstruct those inspections.

The record of this case demonstrates that the Certificate of Compliance inspection was requested by the defendants and that the ship prepared for it in advance. The obstruction that took place in this case was not only the making and use of the fabricated ORBs, it was deceptive and misleading conduct and multiple false statements made to multiple Coast Guard inspectors over the course of at least three days.

Defendant's criminal intent was not limited to his cover-up of past discharges. He was intent on covering up the current breakdown of the ship's equipment which he knew would lead to a detention. But for the herculean efforts of the Coast Guard inspectors, Vastardis and the *M/T Evridiki* would still be plying the seas dumping oil contaminated waste overboard and falsifying official ship records. In so doing, they gained a financial advantage over law-abiding companies that paid the costs necessary to comply with the law. Defendant made a similar choice to continue his lucrative employment rather than insist on legal operation or seeking other employment.

---

[1] The United States does not seek to re-litigate here or at sentencing the applicability of the 6 level or 4 level enhancement under 2Q1.3(b)(1) with regard to Count 1. The government views *United States v. Abrogar*, 459 F.3d 430 (3d Cir. 2006), as wrongly decided as to the applicability of the 6-level enhancement for ongoing and repetitive discharges made outside of U.S. waters. As previously argued in the government's Sentencing Memorandum, a 4-level increase is applicable pursuant to the plain language of the 4-level enhancement, which does not contain the "resulted in" language relied upon by the *Abrogar* Court. Regardless, even if defendant's extraterritorial misconduct does not result in a 4-level enhancement, it is subject to consideration by the Court pursuant to 18 U.S.C. § 3553.

Conduct of this flagrant a nature mandates a significant sentence. The domestic and international requirements defendant flouted are longstanding and well known. Compliance with this international regime depends upon a universal understanding that non-compliance will be met with serious consequences. A sentence of probation alone, would not provide specific or general deterrence.

To date, while defendant has been forced to remain in the United States during the pendency of this enforcement action, he has suffered no financial loss because of his actions. Under the Surety Agreement between the United States, Evridiki Navigation, and Liquimar Tankers Management Services, the corporate defendants paid Vastardis the following living expenses while he remained in the United States: reasonable lodging; a meal allowance of $50.00/day; and health care coverage. *See* Agreement on Security, Para. 3(b) (March 28, 2019). Exhibit 1. This commitment continues to this day, since under the Agreement, payment of these costs shall continue, regardless of employment status, until the United States advises that defendant Vastardis' presence is no longer necessary. *Id*. The corporate defendants also have paid Vastardis his total wages while he remained in the United States. *See Id*., at Para. 3(c). This commitment continued at least until the time of his conviction. Under his employment contract, defendant has been paid €13,050/month (approximately $14,340/month). See Seafarer Employment Agreement, Art. 3 (Govt. Trial Ex. 20). Assuming defendant Vastardis continued to receive his wages from March 11, 2019 (the date the ship arrived in the United States) until December 19, 2019 (the date defendant Vastardis was convicted), Vastardis continued to receive his wages for nine months, totaling approximately $129,060, without any expenses for room and board. Additionally, Defendant has failed, even with the continuance of sentencing, to provide full financial disclosure to the Office of Probation.

The United States recommends that the Court ban Vastardis from returning to the United States, including as a crewmember or passenger on a vessel, for three years during a period of supervised release or probation in order to achieve the sentencing goals in 18 U.S.C. § 3553.

## Sentencing Disparities and Grounds for a Variance

The Court has apparently signaled that it is considering a sentence of probation notwithstanding its finding of an offense level of 14. Defendant has argued that all cases of this sort warrant probationary sentences and that a sentence of probation is needed to avoid unwarranted sentencing disparities. In support of these arguments, he has cited cases in which a defendant received a sentence of probation and little or no fine. Defendant also contends, among other things, that COVID-19 provides additional grounds for a variance.

As set forth in the government's prior submission, defendant's argument regarding unwanted sentencing disparities is incorrect. He seeks to compare himself to the vast majority of defendants who have pleaded guilty to failing to maintain an accurate ORB, in violation of 33 U.S.C. §1908(a), accepted responsibility by pleading guilty, expressed remorse, and/or cooperated in some fashion. Defendant's situation is markedly different because of his conviction on obstruction of justice charges and because he has not accepted responsibility or expressed any remorse. While each case differs, the range of sentences in cases involving similar conduct is between probation and 21 months, with cases previously cited by government in the 3 to 12 month range. Thus, it cannot be said that a term of incarceration would work an unwarranted sentencing disparity.

With respect to COVID-19, the government does not view it as a basis for departing or varying from the applicable sentencing guidelines. However, we appreciate the concern expressed by Defendant and are prepared to consider an proposal by the defendant for a delayed reporting date. That said, should the Court choose to sentence Defendant to a term of probation, the

government recommends that the Court make clear the seriousness of the conduct by imposing a significant criminal fine, and ordering Defendant serve the maximum period of "supervised" release during which time defendant will be banned from entering U.S. ports and waters.

**The Court's Guideline Analysis**

The government's view of the applicable guidelines was set forth in the Sentencing Memorandum submitted previously. The Court has declined to adopt the government's guideline calculation as it relates to sentencing enhancements. While respecting the decision of the Court, the government wishes to briefly clarify the factual record supporting certain issues addressed in the Memorandum Order.

1.   Public/Private Trust Enhancement

When considering whether Defendant abused a position of trust in relation to the obstruction counts, the Court noted "[b]eing Chief Engineer did not give him any special ability or position to deceive the Coast Guard. Doc. 169 at 8. The Government respectfully disagrees and provides this supplemental response for the record. In sum and substance and further explauied below, Defendant's position and responsibilities placed him in a unique position to obstruct the Coast Guard inspection, thereby warranting application of the 2-level enhancement set forth at §3B1.3 for all counts of conviction.

As developed on cross-examination, neither LT McGuire, Chief Warrant Officer Studie, nor Chief Warrant Officer Turman are engineers, let alone licensed and experienced chief engineers. They are inspectors who rely heavily on the honesty and transparency of the regulated industry every day. When a person of Vastardis' stature lies and obstructs, it undermines the entire regulatory regime. By virtue of his training, experience and position, Defendant was not only the designated representative of the owners and operators for all matters involving engineering and the engine control room, but he was also an expert engineer with the greatest engineering

knowledge and responsibility of anyone present. During the inspection of the *M/T Evridiki*, as is customary, Vastardis was the senior ship officer to whom the Coast Guard inspectors directed questions and relied upon.[2]

Studie testified that his review of the ORBs raised no suspicions. The documents, including the IOPP and calibration certificate for the oil content meter (OCM), appeared to be in good order. Defendant knew at that exact moment that he had made false entries and omissions in the ORBs to make them appear legitimate, and he knew that the Coast Guard would conduct a physical inspection of the engine room and Oily Water Separator (OWS). Vastardis further knew that it was not possible to operate the OWS without tricking the OCM. He also knew that the certificates attesting to recent calibration were fake. Studie asked Vastardis to run the OWS and Vastardis did so knowing that the OCM would read 0 parts per million oil. Vastardis even knew that if Studie opened the sample line in front of the OWS, that the OCM would still read 0 ppm. Had Studie not uncovered the second valve, then Vastardis would no doubt have continued to make illegal discharges. Defendant also sought to deceive Officer Turman with the fictitious claim the OWS was operated with the OCM sample line open. For the first two days of the inspection, Vastardis mentioned nothing about the soot contamination in the OWS. It wasn't until the inspectors ordered Defendant to open the OWS that the massive soot contamination was discovered.

---

[2] In this case, the position of the chief engineer to obstruct was enhanced because: (1) Vastardis was specifically assigned the task of maintaining the ORB – he physically kept the book, took it to others to make entries, made all entries regarding his operation of the OWS, and took it to the Captain to sign every page before every port call, including the Coast Guard's inspection in Delaware; (2) the Captain had no independent knowledge regarding the contents of the ORB; (3) Varstardis was assigned to operate and supervise the operation of the OWS and was present for its operation at sea; (4) Vastardis was the person who demonstrated the operation of the OWS; and (5) Vastardis was responsible for overseeing maintenance of the engine room.

2.  Obstruction Enhancement

The Court declined to apply an enhancement for §2J1.2(b)(3), which calls for an increase of 2 levels if the offense: "(A) involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects; (B) involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter; [3] or (C) was otherwise extensive in scope, planning, or preparation…." With regard to subsection A, the Court viewed the increase as applicable if the records were created or altered for a particular occasion, rather than apparently unrelated false entries made before the time of the Coast Guard inspection. Defendant did both.

As Chief Warrant Officer Aaron Studie explained in his testimony, his routine inspection (of every ship) focused on several prior discharge entries, because they represented how the ship was disposing of its waste overboard. Defendant's fabrication of these many historic entries and his overall maintenance of the ORBs was made in anticipation of the Coast Guard inspection and had the desired obstructive effect of suggesting normal operations. The false ORBs in this case were created for the purpose of deceiving the Coast Guard during so that the vessel would pass a MARPOL inspection and be able to trade in U.S. ports and water. Defendant also continued to maintain false and fictitious ORBs in order to conceal known equipment failures and ongoing non-compliance with MARPOL.

With regard to subsection B, it bears mentioning that official ship logs are nearly sacred writ in maritime cases. As one court observed, "Suffice it to say that under the law of the sea, when

---

[3] A review of the record highlights that evidence was destroyed during the inspection. As presented at trial through the admission of Defendant's audio interview, and the before and after photographs presented by Officer Studie, a red sticker certifying calibration in 2007 was removed from the OCM during the first hours of the inspection. It is reasonable to infer that Defendant was responsible despite his denial in response to the Coast Guard's questions. *See* Gov. Ex. 32; Studie Testimony.

7

a party comes into court with log entries which will not stand the test of credibility, that party's chance of success in the litigation is little short of non-existent." *Capehorn S.S. Corp. v. Texas Co.*, 152 F. Supp. 33, 36 (E.D. La. 1957). Falsification of such a log has, in at least one instance, been tantamount to evidence of *mens rea*. *See Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha*, 102 F.2d 450, 453 (2d Cir. 1939) ("[W]e cannot avoid the conclusion that [the log] had been dressed up to excuse the ship's faults. That goes much further than merely to discredit the document itself; it is positive evidence upon the very issue, and weighty evidence as well. When a party is once found to be fabricating, or suppressing, documents, the natural, indeed the inevitable, conclusion is that he has something to conceal, and is conscious of guilt.") (citation omitted).[4]

ORBs were required by MARPOL, the flag state and by the United States. Because his license requires MARPOL training and knowledge, Vastardis knew that courts of law ashore would rely on the ORBs. MARPOL contains a provision requiring that the ORBs be "preserved" on the vessel for three years, and authorizes that any party may to inspect the ORB to determine MARPOL compliance. MARPOL further specifies that any party may make a copy of the ORB and require the master of the ship to certify that it is a true copy. "*Any copy so made which has been certified by the master of the ship as a true copy . . . shall be made admissible in any judicial proceedings as evidence of the facts stated in the entry.*" MARPOL Annex I, Reg. 17 (emphasis added).

---

[4] Long is the litany of cases rebuking vessels for tampering with or falsifying logbooks. When a party is once found to be fabricating, or suppressing, documents, the unfortunate but inevitable conclusion is that the defendant has something to conceal, *and is conscious of guilt. See e.g., Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha*, 102 F.2d 450, 453 (2d Cir. 1939) (emphasis added); *see also Otal Investments Ltd. v. M.V. Clary, supra*, 494 F.3d at 58.

With regard to subsection C, the government views the catch-all provision as applicable because Defendant's conduct was otherwise extensive in scope, planning, and preparation. U.S.S.G. §2J1.2(b)(3)(C). The Court's opinion notes that a lengthy time period does not necessarily equal extensive scope and planning. However, Defendant's falsification of the log in this instance involved numerous entries in a particularly critical set of documents as well as taking place over an extended period of time. As mentioned previously, the manifest purpose was to ensure that the ship passed the Coast Guard's anticipated MARPOL inspection. And, it is not just the false entries that were designed to obstruct the Coast Guard's mission, but the overall presentation of regularity presented by the continuous set of logbooks.[5]

In an analogous context, the Second Circuit viewed false ORB entries designed to conceal discharges in violation of MARPOL as apparently warranting a "sophisticated means" enhancement under §2B1.1(b)(10) (warranting a 2-level increase and at least an offense level of 12 if a substantial part of the fraudulent scheme was committed from outside the United States or "otherwise involved sophisticated means" pursuant to then §2B1.1(b)(8)) *See United States v. Kotsakis*, 364 F.3d 45, 51-52 (2d Cir. 2004):

> [W]e find that the district court's departure was impermissible because, as described in the government's proffer, Kotsakis's conduct appears to have been rather sophisticated. The government alleged that Kotsakis made false entries in two oil record books between April 16, 2001 and January 16, 2002, on thirty separate occasions. These entries concealed the fact that Kotsakis routinely instructed his subordinates to dump oily water directly into the sea, most often at night. These falsified entries had numerous technical components, and were made with the purpose of deceiving the Coast Guard. The government further alleged that upon apprehension Kotsakis made false statements regarding these activities to the Coast Guard and hid equipment used to discharge the oily water into international waters.

---

[5] Other documents, including the following show the extensiveness of Defendant's obstruction; (1) Defendant's engine log books which contained no reference to the OWS-related problems; (2) Defendant's "handover notes" which contain no reference to the OWS-related problems; (3) the lack of documentation regarding the need to offload waste on shore; (4) the false and misleading entry in the safety committee meeting log.

It would be incongruous to view the falsification of ORBs to constitute a sophisticated means under the fraud guidelines, but not extensive in scope under the obstruction guidelines.

   3. Defendant's Involvement in False Calibration Certificates

  In its Memorandum Order, the Court assumed that shoreside personnel of a shipping company are generally responsible for a ship having the proper paperwork and questioned Vastardis' personal involvement in the fraudulent use of the fake OCM calibration certificates. The government respectfully disagrees with this statement.

  The International Oil Pollution Prevention Certificate (IOPP) like the ORB must be maintained and kept on boardl. Each oil tanker of 150 gross tons and above operated under the authority of a foreign country that is party to MARPOL 73/78, must have on board a valid IOPP Certificate. 33 CFR 151.19(b). This requirement includes a corresponding obligation to periodically calibrate the OCM. While an owner or operator may or may not be involved in scheduling inspections, the ship is the recipient and repository for such records. As is evident from the BP documents submitted by the government, the fact that the ship could not locate the calibration certificate for six hours alone created an adverse inference that it was a fake. The evidence submitted in Special Agent Frith's declaration proves that conjecture.

  The confidential notes of the BP vetting inspector specifically reference the attendance of Chief Engineer Vastardis when the false OCM certificate was presented to BP. *See* Vachon Declaration, Attachment 2. Vastardis' consciousness of guilt is further demonstrated by the Safety Committee Meeting notes indicated that it was Vastardis that provided a false explanation for the fake certificate. *See* Frith Declaration & Exhibit C.

  When the *M/T Evridiki* arrived in Delaware in March 2019, Vastardis used two false calibration certificates.  Both were allegedly issued while he was on board. He displayed one in his engine room on the OWS, a machine that he was solely responsible for operating. The other

was provided to the Coast Guard during the inspection. It is customary for the Chief Engineer to be present for the issuance of the engineering related certificates and in supplying them to inspectors. The false OCM certificates, like the ORBs, were used to create an appearance of regularity and avoid regulatory scrutiny. As such, the government views their use by Defendant during an official proceeding to be relevant conduct. *See* U.S.S.G. §1B1.3(a)(1).

**Conclusion**

WHEREFORE, and for the reasons stated above, the government requests that this Court impose a sentence that includes a term of imprisonment consistent with the seriousness of the offense and the sentencing guidelines, a significant criminal fine, and the maximum period of supervised release during which time defendant will be banned from entering U.S. ports and waters.

Respectfully submitted,

JEAN WILLIAMS
Deputy Assistant Attorney General
Environment and Natural Resources Division


BY:         */s/ Richard A. Udell*
Richard A. Udell
Senior Litigation Counsel
Environmental Crimes Section
Environment and Natural Resources Division

*/s/ Kenneth E. Nelson*
Kenneth E. Nelson
Senior Trial Attorney
Environmental Crimes Section
Environment and Natural Resources Division

*/s/ Joel La Bissionniere*
Trial Attorney
Environmental Crimes Section
Environment and Natural Resources Division

Dated: May 4, 2020