**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **1:19-cr-66-RGA** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **EVRIDIKI NAVIGATION, INC.,** | ) | |
| **LIQUIMAR TANKERS** | ) | |
| **MANAGEMENT SERVICES, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**LIQUIMAR TANKERS MANAGEMENT SERVICES, INC.'S
MEMORANDUM IN AID OF SENTENCING**

**COMES NOW**, Defendant Liquimar Tankers Management Services, Inc. ("Liquimar"), by and through undersigned counsel, and submits this Memorandum in Aid of Sentencing, the Declaration of Captain Dimitrios Chelios ("Chelios Decl.") and exhibits thereto. Liquimar respectfully submits that a modest aggregate fine in a range of no more than USD 200,000 to USD 400,000 and imposition of a term of unsupervised probation of no more than one (1) year is both appropriate and a sentence which will be sufficient, but not greater than necessary.  In support thereof, Liquimar respectfully submits the following:

**PRELIMINARY STATEMENT**

On December 19, 2019, the jury found the defendants Nikolaos Vastardis, Evridiki Navigation, Inc., and Liquimar Tankers Management Services, Inc., each guilty of four (4) counts. Liquimar was <u>vicariously</u> liable for the otherwise unknown, unwanted, and unauthorized misconduct of Vastardis while serving as the M/T EVRIDIKI's Chief Engineer, in violation of United States Code sections: 33 U.S.C. § 1908(a), 18 U.S.C. § 1519, 18 U.S.C. § 1505, 18 U.S.C. § 1001, and 18 U.S.C. § 2. Liquimar was not convicted of any conduct outside of C/E Vastardis

1

and which occurred onboard the Vessel while in United States waters.  It is undisputed that there was no involvement, knowledge, or willful blindness by shoreside personnel or management.

For each of these offenses, the maximum possible penalties that may be imposed on Liquimar are: (1) a fine of not more than USD 500,000; (2) a term of probation of not less than one (1) and no more than five (5) years; and (3) a special mandatory assessment of USD 400.  No sentencing court has **<u>ever</u>** imposed a maximum fine after trial for a first-time (or even a second time) offender in any similar matter.  Indeed, no sentencing court has ever come close under any similar set of facts or circumstances.

It is respectfully submitted that a modest fine, if any, is warranted in this case, once the Court considers all of the saliant facts in this case, including *inter alia*, that Liquimar is a first time offender[1] (with a long and unblemished history as a leading responsible corporate steward); the applicable provisions of 18 U.S.C. § 3553 and 18 U.S.C. § 3572; and the prompt remedial actions it has implemented to review, revise, and strengthen its environmental compliance and awareness programs.

Liquimar also submits that given the robust remedial work which Liquimar has performed to ensure no similar conduct would happen again (the effectiveness of which has been proven by three (3) subsequent years the Liquimar fleet has traded world-wide without a single detention or significant deficiency) there is no need for a lengthy term of probation and/or a different[2] Environmental Compliance Plan (ECP). In the event the Court may consider imposing a term of probation, it should be no more than the statutory minimum of one (1) year unsupervised probation

---

[1] Liquimar has never previously been charged or convicted of any criminal offense, and is a "first time offender," which is an important mitigating factor in the determination of an appropriate sentence. *See United States v. Sheffer*, 896 F.2d 842, 845 (4th Cir. 1990) (approving the District Court's taking into account the defendant's status as a "first time offender" in imposing a less severe sentence).

[2] "Different" is not synonymous with "better."

and the Court should permit Liquimar to continue to operate pursuant to its existing comprehensive Environmental Management System (EMS) it has developed and successfully implemented, along with other significantly enhanced environmental policies and procedures.

## FACTUAL BACKGROUND

### I.     LIQUIMAR TANKERS MANAGEMENT SERVICES

Liquimar is incorporated in Liberia and conducts business from its principal office located at 1-3 Alopekis Street, 10675, Athens, Greece. It provides commercial and technical ship management services to clients which own ocean-going oil tankers; one of which being the M/T EVRIDIKI. At present, Liquimar manages a modern fleet of five (5) Suezmax and Aframax tankers, the M/T EVRIDIKI, M/T ORPHEAS, M/T AMFITRITI, M/T IASONAS, and M/T AFRODITI.  Chelios Decl., at ¶4.

Liquimar has a dedicated shore-side staff of twenty-six (26) employees, experienced in international shipping across several departments which include Health & Safety, Environmental, Marine Technical, Manning, Operations, Supply, Chartering, Quality, Accounting, IT, and Legal-Claims. *Id*., at ¶ 8. In exchange for the robust services it provides to its ship owning clients, Liquimar receives a modest gross fixed management fee of $1,000 per day per vessel, *i.e.* a total of $1,825,500 (5 vessels x $1000 x 365 days). *Id*., at ¶ 9. Liquimar's most recent financial statement submitted to the Greek Ministry of Shipping shows that the annual profits for the company in 2021 were $5,615.72. *Id.*, at Exhibit 1.

### II.    THE VESSEL

The M//T EVRIDIKI ("the Vessel") is a 167,295 dwt crude oil tanker built in 2007.  The vessel has been owned by co-defendant Evridiki Navigation, Inc. and managed by Liquimar since its delivery in 2007. Chelios Decl., at ¶ 11.  The Vessel operates under the supervision of the

Liberian Flag State Administration[3] and the Liberian International Ship & Corporate Registry (LISCR), which provides the day-to-day management of Liberia's extensive vessel registry. *Id*.

United States Courts have long credited the Liberian government for operating an excellent ship registration agency. *See, e.g., European-Am. Banking Corp. v. M/S Rosari*a, 486 F. Supp. 245, 254 (S.D. Miss. 1978). LISCR is headquartered in Vienna, Virginia (with offices and employees around the world) and is one of the largest ship registries in the world. LISCR's head of Maritime Operations & Standards Office, Capt. David Pascoe, is a veteran of both the United States Coast Guard and the United Nations' International Maritime Organization (IMO). Notably, Liberia enjoys an elite ranking on the Paris MoU's White List for quality flags under which to register a vessel (and approximately twenty-three (23) spots higher than the United States).[4] The rankings are based on the quality of the registry and enforcement of international maritime laws, which helps owners choose countries that keep their ships sailing at high standards. Liberia is comfortably in the same tier of countries as the United Kingdom, Norway, German, Japan, and Italy, and ranked among other top twenty (20) Flag Administrations world-wide. *Id*.

The M/T EVRIDIKI enjoyed a long and strong record of environmental compliance prior to her detention at Delaware in March 2019. *See* Trial Tr., 964:12-15 (Officer Studie confirming that it was a "really nice vessel" and in "great shape."). The Vessel's physical plant and engine room was in good order and condition; had been repeatedly (successfully) inspected by third-party regulatory bodies; was consistently found to be constructed as per design; and was reportedly being maintained by her crew as intended. *See* Chelios Decl., at ¶¶ 12-13, Exhibit 2-3. The piping and

---

[3] The Flag State of a commercial vessel is the sovereignty under whose laws the vessel is registered or licensed and is tasked with certifying a ship's compliance with international standards. *See*, *e.g.*, *United States v. Abrogar*, 459 F.3d 430, 432 (3d Cir. 2006).

[4] The Paris MOU is an organization of twenty-seven (27) maritime administrations which seeks to "eliminate the operations of sub-standard ships" and annually ranks nation's flag administrations. *See*, https://www.parismou.org/detentions-banning/white-grey-and-black-list. Last accessed April 5, 2022.

valve arrangements were consistent with the Vessel's class approved drawings which had been inspected and approved by the Classification Society, DNV-GL. Trial Tr., p. 1230:1-21 (wherein the government's technical and marine engineering expert, James Dolan testified that there was no illegal bypass arrangement, no discrepancies between the oil record book entries and sounding logs, and that the oil record book entries matched the data from the oil content meter and the deck logs with respect to the Vessel's position). Dolan also confirmed that DNV GL is a leading member of the International Association of Classification Societies and is a highly reputable company, equivalent to his former employer American Bureau of Shipping (another leading Classification Society which had certified the Vessel's Safety Management System and issued its ISO certifications). *Id.*, p.1205:2 – 1207:3.

## III.   LIQUIMAR HAS TAKEN A COMPREHENSIVE AND PROACTIVE APPROACH TO IMPLEMENTING SIGNIFICANT REMEDIAL MEASURES

Given the length of time between the conviction and sentencing in this case due to the COVID-19 pandemic, there are unique circumstances and facts for the Court's consideration at sentencing. Specifically, Liquimar has been doing the comprehensive work many companies agree to perform in similar cases since the time of the detention of the Vessel in March 2019. *See* Chelios Decl., at ¶¶ 14-16. Liquimar set out to improve its policies, procedures, and systems to ensure that no similar event ever happens again. *Id.* As explained in robust detail in the Chelios Declaration, Liquimar has made great efforts to upgrade and revise corporate oversight and supervision of the vessels in the fleet over the past three (3) years. *Id.* To ensure effective shore-side and vessel buy-in to the improved and updated policies and procedures, Liquimar terminated the prior Designated

Person Ashore[5] for the company, Emmanouil Apostolou, and replaced him with Captain Chelios in March of 2020. Chelios Decl., at ¶¶ 1-4.

In addition, and among other remedial actions, Liquimar employed the services of a third-party environmental compliance company, Total Quality Consultants ("TQC")[6] to assist with the review and enhancement of the onboard systems and policies. Chelios Decl.,¶¶ 14, 16A. The third-party review of Liquimar's systems, policies and procedures took place over the course of many weeks during 2019 and 2020. *Id*. TQC spent numerous hours in the Liquimar office to audit, meet with, and review Liquimar departments and to train employees. *Id*. TQC prepared "tailor made" and improved Safety Management System Manuals, Planned Maintenance Systems and an EMS Manual (all of which have been implemented and were submitted to the Probation Office). *Id*. Following the preliminary review and the drafting of the updated manuals by TQC, all of Liquimar's departments and managers were involved in the review, comment, approval, and subsequent implementation of the enhanced policies and procedures. Chelios Decl., at ¶¶ 16A-16C.

### A. Updated Manuals, Procedures, and Policies to Prevent Reoccurrence

The Safety Management System and Planned Maintenance System manuals were updated and revised to clearly and effectively communicate exact steps to be taken onboard to perform operational testing, cleaning, maintenance, and calibration of the Oily Water Separator and the

---

[5] The designated person ashore is a person designated by the technical manager to serve as a contact between the crew onboard the vessel and the technical management personnel." *Seven Seas Cruises v. V Ships Leisure Sam*, 2011 U.S. Dist. LEXIS 169236 (SDFL 2011)(citing ISM Code, Sec. 4.).

[6] Total Quality Consultants (TQC) is a highly specialized maritime consultancy firm established in 1994. TQC assists and provides solutions for clients in meeting all regulations and shipping codes and to improve the operational efficiency of their fleets through the development and implementation of structured, efficient and effective management systems. The company has served more than 600 ship management companies over 18 years. Additionally TQC is ISO 9001:2015 certified, demonstrating the quality assurance to our clients. http://tqc.gr/en/normal/home, last accessed April 10, 2022.

associated systems and piping, including but not limited to the cleaning and inspection of bilge and bilge water tanks. *Id.*, at ¶ 16C. The Fleet Instructions Manual Chapter C – Environmental Protection was reviewed, revised, and updated in March 2019 and January 2021, and covers the updated instructions for properly maintaining the ORB and the implementation of a comprehensive Environmental Seal Log System to prevent non-MARPOL approved discharges overboard. *Id. at* 16D and Exhibit 4. The seals are maintained by the Master of the Vessel, who monitors the requests and distribution of replacement seals whenever the pollution prevention equipment is used. Detailed instructions have been provided to the crew regarding the Seal Location and Seal Removal procedures for the management and monitoring of the seals. *Id.*, at § 1.7 of Exhibit 4.

The Health, Safety Management, & Environmental Protection Procedure – QP 13 was updated to reflect Liquimar's strict requirement that every vessel comply with International Law as mandated by IMO conventions such as SOLAS and MARPOL and the national laws of each Port State. *Id.*, at ¶16E. Any potential or actual non-compliance by a Vessel or crewmember is unacceptable; any deviation from required compliance with laws and regulations will not be tolerated; and any violations will lead to disciplinary action, including termination and reporting to relevant law enforcement authorities. *Id.* The procedure also places a focus on the paramount importance for crewmembers to be observant and to immediately report any suspected misconduct that they observe or hear about through the company's open reporting procedures (which provide avenues for anonymous reports and also makes clear that there is no retaliation for making a report). *Id.* After training, each crewmember reviews and affirms his commitment by execution of a "Declaration of Compliance with Health, Safety Management & Environmental Protection Policy" as well as a "Monthly Environmental Commitment Declaration" to confirm that they have not participated in, witnessed, and/or become aware of any illegal or prohibited activity. *Id.*, at Exhibit 5.

A new and improved Bilge Water Management Plan (BWMP) for use onboard all Liquimar managed vessels was developed and implemented. *Id*., at ¶16F. The BWMP includes inspections and procedures for senior officers on the use and operation of the Vessel's Oily Water Separator and upgraded instructions on the conditions under which discharge overboard of bilge water is permitted. *Id*., at Exhibit 6.  Liquimar has spent a tremendous amount of time, money, and effort on a comprehensive refresher training program for shore-side and shipboard staff focused on MARPOL regulations and compliance. *Id*. Updated training on policy and procedure awareness and the anonymous reporting and anti-retaliation measures in place onboard the vessel and shore-side to encourage reporting of any non-conformity or failure to comply with applicable laws, regulations, policies, or procedures.  *Id*.

All senior officers are required to attend at the office in Greece (at the Company's expenses) for pre-joining familiarization training to be briefed on the SMS, EMS, and latest developments on safety and environmental protection. *Id*.  For re-joiners who have served onboard vessels in the fleet before, the meetings last approximately one (1) day and include meetings with all of the Liquimar departments. *Id*. For new officers, the office meetings last approximately two (2) days. *Id*., at ¶16H. Additional internal and external environmental audits across all five (5) vessels within the Liquimar-managed fleet have been completed to ensure compliance with all policies and procedures and to detect any potential deficiencies or non-conformities. *Id.*, at ¶ 16L and Exhibit 9.

### B. Update to OWS Procedures and Requirements

Liquimar has also taken practical and easy to understand corrective and remedial measures onboard all vessels to prevent a similar incident in the future.  Liquimar reviewed all vessels for a similar valve and sample line design (which had been Class approved onboard the M/T EVRIDIKI), to make sure there was no similar arrangement on any other ship which could

potentially be manipulated. *Id*., at ¶16I. In addition, Liquimar has made sure that all sample line piping matches the most-up-to-date recommendations for safe operation of the OWS system. *Id*. An updated Oily Water Separator Check List was distributed throughout the fleet and is maintained onboard each vessel to ensure that the crew is accurately and effectively performing maintenance and operational tests on the OWS and its associated equipment. *Id*., at Exhibit 8. All Oil Content Meters on each OWS across the fleet have been replaced with the latest model available from original maker (DECKMA Hamburg). *Id*., at ¶16J. The reason is that the newly installed model is fitted with sample flow sensor, further limiting the opportunity for OCM or OWS manipulation. *Id*. If no sample flow is detected, the discharge through OWS is immediately stopped. As part of this updated OCM, fresh-water cleaning of the measuring cell is performed through electronic control. *Id*.

The internal process and procedure for use of the OWS has also been updated and now requires that the Engineer in charge of the operation not only take permission from the bridge prior to use of the OWS and that the officer on watch must turn on the electric switch contained on the bridge permitting the OWS to be operated in the engine room. *Id*., at ¶16K. Said another way, the OWS can **only** be run with the approval of the officer in charge on the deck, providing a secondary check and oversight on the usage of the system onboard each Liquimar managed vessel. All of these steps taken are above and beyond what is even required in the government's proposed ECP submitted to the Probation Office.

### C. Environmental Management System

Following the detention of the Vessel in March 2019, Liquimar immediately undertook a comprehensive review of its existing systems, including its environmental compliance policies and procedures and looked for ways to improve. *Id*., at ¶¶ 14, 17. In early 2020, Liquimar voluntarily prepared and implemented an EMS manual for use on all vessels managed by Liquimar (including

the M/T EVRIDIKI) and to apply to all shore-side personnel. *Id*., at ¶ 17.   The purpose of the new EMS was to ensure that all vessels fully comply with all maritime environmental requirements under applicable international, flag state, and port state law and all applicable U.S. federal and state statutes and regulations and that an effective system is in place to detect and prevent the occurrence of violations. *Id*., at ¶18.

Simply put, the EMS which has been implemented has used, as its guidepost, the functional requirements from the ECP program instituted by the U.S. Department of Justice (and requested by the government in this case) <u>and</u> ISO 14001.[7]   The chief goal of the government's ECP is for an organizational defendant to develop and implement an EMS during years the first two (2) years of probation. Here, Liquimar has already undertaken that significant and comprehensive work to increase its awareness and commitment to zero-tolerance for any further violations; as well as to prevent the violation of any international and/or U.S. laws and regulations by developing the EMS issued on January 24, 2020. *Id*., at ¶¶ 18-19, Exhibit 10.   Liquimar's EMS provides a comprehensive, encompassing and rigorous program which utilized the required information, framework, and requirements that government required ECPs and EMS manuals routinely require in similar cases.[8] *Id*.

---

[7] "ISO 14001 sets out the criteria for an environmental management system and can be certified to. It maps out a framework that a company or organization can follow to set up an effective environmental management system." *See* https://www.iso.org/iso-14001-environmental-management.html (International Standards Organization), last accessed April 12, 2022.  The government's proposed ECP requires that a future EMS be consistent with ISO 14001 and it is the standard regularly used as an international benchmark for quality environmental management systems.

[8] Notwithstanding, the government has maintained a recommendation to the Probation Office that Liquimar be sentenced to a term of probation of five (5) years and to start from scratch with the government's *pro forma* ECP.  Respectfully, such a result would be antithetical to the goals of improving environmental compliance and would unhelpfully penalize Liquimar for taking substantive, comprehensive, and expensive steps to develop and implement the EMS.

Liquimar did not stop its efforts with the creation and implementation of an improved EMS. It continued to review and revise the EMS following its implementation on the fleet and receipt of feedback from the crewmembers tasked with carrying out the requirements of the EMS. *Id.*, at ¶¶ 20-23. EMS Revision No. 1 was issued on May 8, 2020 (Exhibit 11) (clarifying the implementation of Annex V of MARPOL 73/78, as amended by resolution MEPC.76(40) and referenced by regulation 16 of Annex VI to MARPOL 73/78 governing the organization and processing of garbage generated onboard and use of the incinerator). EMS Revision No. 2 was issued on February 22, 2022 (Exhibit 12). The updated EMS included revisions to Sections SOP-05. 4.9, 4.1, 4.7, 4.11, 4.17 and 4.20.  These revisions were focused on enriching the existing list of environmentally critical spares (based on the maker of each equipment advice), while providing further instructions for items that during the training sessions and onboard visits found to be in need for additional clarifications to ensure proper implementation of the EMS. *Id.*

A comparative analysis of the EMS with the draft ECP proposed by the government in this case shows that the functional requirements in the ECP proposed by the government are already being met and exceeded by the EMS.  For example:

- Liquimar created a new position in the company, the Corporate Compliance Manager (CCM) (and a required role in the ECP), a role filled by Konstantinos Nikolaidis. Mr. Nikolaidis' company email is environmental@liquimar.com and all vessels and crewmembers are also provided his office telephone number and mobile number so that he can be reached any time day or night. As defined by the EMS, he is the person responsible for monitoring the environmental issues of the operations of the Company and the managed vessels, as well as for ensuring the development, implementation and documentation of the EMS. *Id.*, at ¶21.

- The CCM carries out several tasks aimed at ensuring compliance and continuous improvement onboard vessels within the fleet, including but not limited to:

    a. Tracking all five (5) vessels and routinely providing reminders and instructions on the steps necessary to ensure proper compliance with proper fuel changeover and emissions control when the vessel is within a Sulfur Emission Control Area (SECA).

    b. Making sure that the vessels are following all regulations with respect to permissible use of the incinerator, OWS, and garbage disposal based on the location of each ship.

    c. Regular review and analysis of excerpts of the Oil Record Book, Sounding Log, and vessel records to assess the production of bilge water and sludge on board and keep track of the crew's processing of the waste though the OWS and Incinerator.

    d. Close cooperation with the technical department manager and spares manager to ensure that all vessels have properly maintained equipment, machinery, and spares onboard.

    e. Close review of the scheduled and planned maintenance plan and confirmation that authorized service technicians are regularly scheduled to inspect and calibrate the pollution prevention equipment (as well as other critical machinery and equipment).

    f. Maintaining regular contact with the crew's officers to ensure that in the event something needs to be addressed with any of the pollution prevention equipment, it is completed expeditiously and safely.

    g. The point of contact to assist the crew with arrangement for the discharge ashore of bilge water and sludge on an as-needed basis.  The crew and all shoreside employees are trained that there is an open budget for shoreside disposals, so that any and all arrangements can be made to ensure safe operation of the vessel and protection of the environment without worry about cost.

    h. Follow-up and review crew compliance with completing environmental computer based training programs to ensure that officers and ratings understand the EMS and company policies and procedures.

*Id.*, at ¶ 22 and Exhibit 20.

- Liquimar has also spent significant time, money, and effort to conduct and complete comprehensive internal environmental audits of the fleet of five (5) vessels that it manages, including the M/T EVRIDIKI. *Id.*, at ¶25 and Exhibit 13.

12

- The Liquimar EMS tracks and largely follows the language and requirements of the government ECP as it relates to Sections I, II, III, IV, VII, VIII, and IX.  The main differences between the ECP and the EMS is that the ECP proposes the appointment of a Third-Party Auditor and CAM for the organizational defendant to be able to develop an EMS and comply with the components of the ECP, whereas Liquimar has completed those requirements voluntarily. *See* Chelios Decl., at Exhibits 10-12.

### D.  Evidence of the Effectiveness of the EMS and Enhanced Policies

Since the detention of the Vessel in March 2019, no port state entity anywhere in the world has detained a vessel within the Liquimar managed fleet for any MARPOL or related violation or offense. The updated external audits, surveys, and inspection reports demonstrate that Liquimar managed vessels have sailed and continue to sail around the world without incident, issue, or detention, despite operating at sea in what are difficult and challenging conditions (all of which being exacerbated by the pandemic). Respectfully, there is no greater evidence of Liquimar's commitment to continuous improvement and the effectiveness of its updated policies and procedures, than the fact that all Liquimar managed vessels and their crews have fully complied with all maritime laws, regulations, and local requirements under applicable international, flag state, and port state regimes and all applicable U.S. federal and state statutes and regulations.

The Liquimar managed vessels and their crews were subject to several inspections by third parties in 2020 and 2021 with **no detentions imposed and no major deficiencies noted or observed**. Chelios Decl., at ¶¶ 26-29.  A brief summary of the external reports, inspections, and audits include:

1. The vessels underwent Port State Control inspections[9] a total of six (6) times in 2020 and eight (8) times in 2021 at various ports worldwide with zero detentions

---

[9] "A port state control inspection is 'the inspection of foreign ships in national ports to verify that the condition of the ship and its equipment comply with the requirements of international regulations and that

and no substantial environmental (or other) deficiencies identified by any port state authorities. Copies of the Port State Control Reports for 2020 and 2021 are attached as Exhibit 14.

2.  The vessels underwent SIRE inspections[10] a total of eighteen (18) times in 2020 and fifteen (15) times in 2021. Critically, there were no major deficiencies or environmental issues noted. Copies of the SIRE Reports for 2020 and 2021 are attached as Exhibit 15.

3.  The vessels underwent Flag State inspections[11] a total of five (5) times in 2020 and eight (8) times in 2021 with zero major deficiencies. Copies of the Flag Inspection Reports for 2020 and 2021 are attached as Exhibit 16.

4.  The vessels underwent Class Survey inspections[12] carried out by the American Bureau of Shipping, Llyod's Register, and DNV, some of the premiere classification societies in the world which also confirmed that the Vessels were well maintained, in good order and condition, and had no environmental or issues. Copies of the Class Survey Reports for 2020 and 2021 are attached as Exhibit 17.

5.  Copies of the Terminal Satisfaction Reports for each of the vessels for the years 2020 and 2021 are attached as Exhibit 18. Each vessel has an average of twenty (20) to thirty (30) reports for the two (2) years and almost always scored a "very good" which is the best grading that terminals can give.

---

the ship is manned and operated in compliance with these rules.'" *Monarch Shipping Co v. United States*, 2013 U.S. Dist. LEXIS 152076, *3 (SDFL 2013)(*quoting* Int'l Maritime Org., *Port State Control*, http://www.imo.org/blast/mainframe.asp?topic_id=159).

[10] The Oil Companies International Marine Forum (OCIMF) is an organization formed in April 1970 that works to improve the standard of vessels involved in petroleum operations. Nearly 100 oil majors are members of OCIMF. In 1993, OCIMF developed an inspection program called SIRE. *CITGO Petroleum Corp. v. Seachem*, 2014 U.S. Dist. LEXIS 170843, *3-4 (SDTX 2014). "SIRE is a tanker risk assessment tool—a large database of up-to-date information about tankers and barges used by OCIMF members and programme recipients. It is a uniform, standardised, objective inspection process that systematically examines tanker operations." *Id.* (citations omitted). Members of OCIMF commission comprehensive vessel inspections and appoint OCIMF-accredited SIRE inspectors to inspect vessels using SIRE standards and the inspectors look at a wide range of items related to the safety, operation, and environmental standards in place on a vessel. *Id.*

[11] "[T]he law of the flag doctrine ... provides that a merchant ship is part of the territory of the country whose flag she flies, and that actions aboard that ship are subject to the laws of the flag state." *United States v. Jho*, 534 F.3d 398 (5th Cir. 2008). In this case, the vessels are flagged by the Liberian Flag State Administration.

[12] A classification society is a non-governmental organization that establishes and maintains technical standards for the construction and operation of ships and offshore structures. *See* http://www.iacs.org.uk/.

6. The vessels were subject to seven (7) external environmental audits for the years 2020 and 2021. Copies of the External Environmental Audits for 2020 and 2021 are attached as Exhibit 19 and demonstrate the ongoing and continuous improvement efforts by Liquimar to run a safe and environmentally compliant fleet.

Through the first quarter of 2022, the high standards achieved over the past two (2) years have been maintained. There have been no detentions or significant environmental or safety deficiencies noted by any Flag State, Port State, or third-party surveyor, auditor, or inspector. *Id.*

## **ARGUMENT**

## IV. **GUIDELINES AND FACTORS FOR DETERMINING THE APPROPRIATE SENTENCE FOR LIQUIMAR**

In determining an appropriate sentence, the district court is required to consider the factors set forth in 18 U.S.C. § 3553 and 18 U.S.C. § 3572. *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011); *see also United States v. Olhovsky*, 562 F.3d 530, 547-548, 2009 U.S. App. LEXIS 7895 (3d. Cir. 2008). The Court's "overarching" duty is to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough* at 101; *see also Pepper*, 131 S. Ct. at 1242-43. Liquimar was found guilty of violating 33 U.S.C. §1908(a) (Count One), 18 U.S.C. §1519 (Count Two), 18 U.S.C. §1505 (Count Three), and 18 U.S.C. §1001 (Count Four).[13]

U.S.S.G. Chapter Eight applies to the sentencing of a corporate organization convicted of felony offenses. *See* U.S.S.G. § 8A1.1. With respect to a determination of a fine, U.S.S.G. §8A1.2(b)(2) provides that U.S.S.G. § 8C2.1 is to be applied to identify the counts for which provisions U.S.S.G. §§ 8C2.2 through 8C2.9 apply. The rules for calculating the fine range in §§8C2.2 through 8C2.9 are limited to specifically enumerated offenses listed in U.S.S.G. §8C2.1.

---

[13] The relevant guideline section for violations of 18 U.S.C. §1519 is U.S.S.G. § 2J1.2. Liquimar was also convicted of 18 U.S.C. §1505, and the relevant guideline section for this statute is U.S.S.G. § 2J1.2.

However, none of the counts of conviction against Liquimar are covered under U.S.S.G. § 8C2.1. For counts which the applicable guideline is not enumerated in U.S.S.G. §8C2.1, the provisions of U.S.S.G. § 8C2.10 are to be applied in the determination of the fine amount. That guideline section provides that the Court should determine an appropriate fine by applying the provisions of 18 U.S.C. §§ 3553 and 3572 and the various factors contained therein. Accordingly, as found by the Probation Office in the Presentence Investigation Report, the guidelines simply refer the Court back to the statutory sentencing factors for consideration and determination of an appropriate sentence. *See* DI 188.

## V.   ANALYSIS OF 18 U.S.C. § 3553 FACTORS

Pursuant to 18 U.S.C. §3553(a), the Court is directed to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of the subsection." *Kimbrough*, 552 U.S. at 101. The statute requires the Court to ensure a sentence satisfies the enumerated statutory objectives, but also that any sentence imposed is the ***minimum*** sentence necessary to meet those objectives. *Id*. (emphasis added).

### 1.   Nature and Circumstances of the Offenses and the History and Characteristics of the Defendant

This case involves four (4) counts vicariously charging Liquimar for the same underlying (unknown, unwanted, and strictly prohibited) misconduct perpetrated by C/E Vastardis onboard the M/T EVRIDIKI and is not reflective of the history and characteristics of Liquimar.

### A.  Nature and Circumstances of the Offenses

As confirmed by the testimony of the Coast Guard officers who attended onboard the ship, the M/T EVRIDIKI was exceptionally well maintained, as were the entries in the Oil Record Book (despite failing to accurately memorialize what C/E Vastardis was processing through the OWS). As the Court learned at trial, the misconduct concerning the inaccurately recorded operations was

16

limited in scope and time. The evidence was clear that all of the conduct took place without the knowledge of the Vessel's Master, Captain Katsolis and/or Liquimar and/or the Vessel's Owner Evridiki Navigation Inc. Furthermore, the testimony and evidence at trial demonstrated that the vessel had undergone regularly scheduled maintenance on all relevant systems in the Engine Room; all had been found to be in good working order both by representatives of the Flag Administration and Class surveyors (as agreed by the government's expert James Dolan); and this good information was reported by the crew and relevant third-parties to Liquimar.

The testimony of the Coast Guard as to the condition of the Vessel and general helpfulness of the crewmembers during the Coast Guard inspection provides this Court with objective evidence that the systems onboard the Vessel were in good working condition and were able to be maintained, operated, and repaired (when necessary) while the Vessel was at sea. There was no testimony from any of the witnesses of any breakdown of the equipment or any lack of spares onboard. As such, the failure to properly utilize the pollution prevention equipment was the result of the Chief Engineer's own decision(s) on how to operate the Oily Water Separator, not due to an effort to conceal improper or ineffective equipment or machinery onboard.

There was no evidence or testimony presented at trial that any inaccurately recorded discharges of bilge water occurred while the vessel was in U.S. waters. Because the M/T EVRIDIKI is a Liberian-flagged vessel, the laws of the Liberia, as the flag state, apply to acts occurring on the high seas.[14] The United States has neither the authority nor the jurisdiction to prosecute a foreign-flagged vessel for improper discharges of bilge water on the high seas, and in

---

[14] *See United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 307 (2d Cir. 2009) ("There are two pertinent limitations to the application of the APPS. First, [APPS] appl[ies] to U.S.-registered ships wherever they are (including beyond U.S. waters), but to any foreign-flagged ships only "while in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States" …. Second, the APPS states that "[a]ny action taken under [the APPS] shall be taken in accordance with international law."); *see also* 33 U.S.C. § 1912; 33 C.F.R. § 151.09(a)(1)-(5); 33 U.S.C. § 1902(a)(2).

any event, any such conduct is irrelevant to the crimes of conviction in this matter.[15] More to the point, any such acts cannot be considered relevant conduct for determining an appropriate sentence, as the counts of conviction relate to the conduct that occurred while the M/T EVRIDIKI was in U.S. waters.[16] None of the elements of the offenses for which Liquimar was convicted relate to any discharges in U.S. waters.  Instead, the charges relate to recordkeeping offenses and C/E Vastardis' conduct during the Vessel's call at Wilmington, Delaware.

Binding authority from the Third Circuit Court of Appeals in *United States v. Abrogar*, 459 F.3d 430, 435-36 (3d Cir. 2006), confirms that unrecorded discharges occurring aboard a foreign-flagged vessel on the high seas are not "relevant conduct" for the purposes of determining an appropriate sentence in APPS related prosecutions. *See id.* at 436. This holding was recently visited and upheld by the Third Circuit in the appeal by Chief Engineer Vastardis. *United States v. Vastardis*, 19 F.4th 573, 584, 2021 U.S. App. LEXIS 36034, *19, 2021 AMC 456 (3d Cir. 2021) ("the high-seas discharges did not constitute "relevant conduct" for purposes of determining Abrogar's offense level under the U.S. Sentencing Guidelines. The crime was, as here, the failure to maintain an accurate oil record book while in a U.S. port. Accordingly, *Abrogar's* offense did not "result[] in" any pollution, as required for the enhancement.")(citing *Abrogar*).

Liquimar respectfully submits that the offenses for which Liquimar stands convicted are limited to the unauthorized recordkeeping omissions (*i.e.* the knowing failure to maintain an accurate ORB), and conduct related to the Coast Guard's Port State Control inspection of the Vessel, all while in United States water. Liquimar is committed to a "zero tolerance policy" against

---

[15] "We conclude, therefore, that under the APPS and accompanying regulations, Congress and the Coast Guard created criminal liability for foreign vessels and personnel only for those substantive violations of MARPOL that occur in U.S. ports or waters. Stated differently, a MARPOL violation by such a vessel or its personnel is only an "offense" under U.S. law if that violation occurs within the boundaries of U.S. waters or within a U.S. port." *United States v. Abrogar*, 459 F.3d 430, 435 (3d Cir. 2006).

[16] *Id.*

pollution of any kind, a position which is underscored and emphasized by a long history of compliance by the M/T EVRIDIKI and the other vessels in the Liquimar-managed fleet. All regularly call at ports in the United States without incident, but for the anomaly at issue here. This case is the first instance that Liquimar has been involved in any type of criminal prosecution in its history. It is respectfully submitted that based on the track record of compliant lawful operations, the act of the Chief Engineer constitutes an isolated and anomalous incident, which the Court need not fear to re-occur. As such, a modest sentence is appropriate.

### B.  History and Characteristics of the Defendant

Liquimar has placed particular emphasis on all vessels under its technical management be operated in a manner designed to protect and preserve the marine environment. Chelios Decl., at ¶¶ 5-10. The impact and result of this policy is borne out by the fact that vessels within the Liquimar managed fleet had successfully completed thirty-five (35) U.S. Coast Guard inspections in the prior ten (10) years.  The only inspection that resulted in a vessel detention was the March 2019 incident involving the M/T EVRIDIKI.  Based on Liquimar's extensive and exemplary track record of compliance during U.S. port calls, it is respectfully submitted that the incident in question was an isolated event and anomaly. *Id*.  Due to is history of compliance, Liquimar was recognized as a Qualship 21 company by the Coast Guard and has been ISO 9001, 14001, and OSHAS 18001 certified since 1998.  *See* Chelios Decl., at ¶¶ 12-13. Exhibits 2 and 3.

### 2.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

While fully recognizing the intent, application and importance of the APPS statute in the United States' efforts to prevent pollution from ships, Liquimar submits that the Court's sentence in this case should be premised and designed to address and reflect the actual offenses contained in each count of conviction and recognize the vast remedial efforts taken both before and since

trial. Although APPS is a statute related to the protection and preservation of the marine environment, it is a domestic law of limited applicability to foreign flagged vessels for acts committed on the high seas. *See United States v. Abrogar*, 459 F.3d 430 (3d Cir. 2006).

The government will undoubtedly encourage the Court to impose a sentence in this case which includes significant fines and probation period on the basis that the convicted violations are egregious and pervasive pollution events that must be punished harshly to send an appropriate message both to Liquimar and others. However, the facts in this case, as they relate to Liquimar, do not support such a result for all the reasons set forth herein.

### 3.  The Need for the Sentence to Adequately Deter Future Criminal Conduct

Liquimar submits that a fair and just minimum sentence, (premised on the offenses for which it was vicariously convicted), which is not greater than necessary will provide deterrence and encourage others to be proactive in their efforts.  In addition, recognition by the Court of the robust remedial measures voluntarily pursued immediately following the Vessel detention would be significant in producing positive results throughout the industry.

It is respectfully submitted that the Court may (and should) consider the substantial commitment of time, money, and effort that Liquimar and co-defendant Evridiki Navigation Inc. have jointly and severally expended in this matter throughout the investigation, prosecution, and in implementing the remedial measures.  Specifically, the companies spent approximately $450,000 to maintain the crewmember witnesses and C/E Vastardis in the District of Delaware pursuant to the Agreement on Security. Chelios Decl., at ¶10.  Since the incident nearly $400,000 has also been spent to develop, implement, and enforce the robust policies and procedures in the updated SMS, EMS, and other remedial measures.  Chelios Decl., at ¶30. Recognition by the Court of these significant financial commitments as part of the sentence calculation would serve

not only to encourage other owners and operators in the industry[17] to become proactive in ensuring their own compliance with all laws and regulations, but has already served as a substantial deterrent to Liquimar from ever having another similar incident in the future.

### 4. The Need for the Sentence to Protect the Public from Further Crimes of the Defendant

The Court need not be concerned that Liquimar will be a recidivist.  It will not. As more fully set forth herein, following the detention of the Vessel, Liquimar swiftly took comprehensive and extensive action to enhance the onboard systems, procedures, policies, and reporting to prevent any future occurrences of similar issues. The specific measures are set out above at Point III and the Chelios Decl., at ¶ 14-24.  As shown by the "clean" record over the past three (3) years (as well as its prior long history of compliance), there is nothing to protect the public from with respect to Liquimar. It is respectfully submitted that this voluntary and proactive effort, which began soon after the M/T EVRIDIKI was detained and prior to the verdict in this action, addresses this factor and effectively protects the public from this type of conduct in the future on the part of Liquimar and its employees.[18]

### 5. The Kinds of Sentences Available

As Liquimar is an organizational defendant, it can be sentenced to a fine and a term of probation. *See* 18 U.S.C. § 3551(c). The statutory maximum fine for each count for which Liquimar was convicted is $500,000. *See* 18 U.S.C. § 3571(C)(3). There is no mandatory minimum fine for any of the counts of conviction. For the reasons set forth below, Liquimar respectfully submits that a fine of no more than USD 200,000 to USD 400,000 in the aggregate and a term of

---

[17] For example, APPS related prosecutions and the sentences imposed on vessel owners and operators are widely reported in the maritime industry press and trade journals, such as *Lloyd's List*, *Fairplay*, *Tradewinds*, *Maritime Reporter*, and numerous other industry publications, as well by as mainstream media outlets in the U.S. and other seafaring nations.

[18] Respectfully, 18 U.S.C. § 3553(a)(2)(D) is not applicable for a corporate defendant.

unsupervised probation of no more than one (1) year is sufficient but not greater than necessary <u>and</u> in line with other Courts which have conducted trials and imposed sentence.

### 6.   Pertinent Policy Statements

Liquimar is not aware of any applicable policy statement of the Sentencing Commission. *See also*, DI 188, Revised Presentence Report.

### 7.   The Need to Avoid Unwarranted Sentencing Disparities

It is axiomatic that defendants with similar backgrounds which have been found guilty of the same offenses should receive similar sentences. *See Dorsey v. United States*, 132 S. Ct. 2321, 2334 (2012); *see also United States v. Amaya*, 2013 U.S. App. LEXIS 6223 (4th Cir. 2013); 28 U.S.C. § 991(b)(1)(B) (stressing the need to avoid "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct"). Although this principle is expressed in 18 U.S.C. §3553(a)(6), it is referenced in this section of the Memorandum because the primary sentencing decision for the Court with respect to organizational defendant Liquimar is the amount of any fines to be imposed for the counts of conviction.

In *United States v. Diana Shipping Services S.A.,* 2:13-cr-40 (E.D. Va. 2013), a first-time offending ship manager was found vicariously criminally liable on eleven (11) counts in the Eastern District of Virginia. That matter involved a Chief Engineer, a Second Engineer, and a vessel operator, Diana Shipping, all of which went to trial and were found guilty of all eleven (11) counts charged. Similar to this case, the Chief Engineer[19] did not testify in his own defense, yet persistently maintained his innocence throughout the matter. In *Diana*, the allegation concerned an alleged course of misconduct over many months; involved numerous crewmembers; and involved a vessel which called at three (3) different U.S. ports (whereas this case involved a single

---

[19] In *Diana*, neither individual defendant testified in his own defense.

individual and a single U.S. port call).  In weighing all of the sentencing factors and applicable guidance, District Judge Davis, imposed a sentence on the vessel's manager of USD 100,000 per count for a total, aggregate fine of USD 1,100,000 (*i.e.* – USD 100,000 per count). Liquimar respectfully submits that anything in excess of a similar aggregate fine of USD 100,000 per count (*i.e.* no more than USD 400,000), would be greater than necessary and unfairly disparate.

### 8. Restitution

As set forth in the Revised Presentence Investigation Report, there are no identifiable victims and therefore restitution is unnecessary and inappropriate in this action.

## V.    SECTION 3572 FACTORS MUST ALSO BE CONSIDERED

In addition to considering the factors set forth in 18 U.S.C. § 3553(a), the Court is also required to consider the factors set forth in 18 U.S.C. § 3572, to determine the appropriate fine for Liquimar. These factors are as follows.

### A.    Company's Size and Income and Burden of a Fine - 18 U.S.C. § 3572(a)(1)

As reported to the Department of Probation, Liquimar is a modest business with twenty-six (26) employees, who assist in the management of the vessels belonging to its five (5) ship owning clients.  Liquimar earned a modest profit of $5,615.72 for 2021. Chelios Decl., at Exhibit 1. In accordance with the requirements of the Agreement on Security, Liquimar and the Evridiki Navigation Inc. jointly and severally posted cash surety in the Registry of the Court in the amount of **$700,000.00**. *See* 19-mc-77-RGA, DI 2.  Liquimar has devoted a significant budget to the efforts to improve the SMS, Planned Maintenance System, EMS, training, and other remedial measures which have cost approximately $400,000 over the course of the past three (3) years. Chelios Decl., ¶30. That commitment to the development, implementation, and improvement is reflected in the successful audits, surveys, and inspections passed by the Liquimar fleet of vessels around the world.

**B. No Pecuniary Loss Was Inflicted Upon Others, Therefore No Restitution Should Be Ordered – 18 U.S.C. § 3572(a)(3) and (4)**

As set forth in the Revised Presentence Investigation Report, the convictions in this case did not result in any pecuniary loss to others. As such, there were no victims in this case and there is no need to order restitution as part of the sentence in this matter.

**C. Liquimar Derived No Pecuniary Gain from The Offenses – 18 U.S.C. § 3572(a)(5)**

While Liquimar was held vicariously liable for the acts of Defendant Vastardis, his actions did not result in any pecuniary gain for Liquimar. Indeed, the misconduct has been very costly for **both** organizational defendants and highly taxing for the crewmembers who were detained by the government for over two (2) months, but not called to testify at trial. Captain Katsolis and the government's own Coast Guard witnesses testified at trial that the M/T EVRIDIKI was in good order and excellent condition and was supplied with ample spare parts for its pollution control equipment (*i.e.*, the incinerator, oily water separator and oil content meter).  Moreover, Liquimar placed no time or monetary restrictions on the vessels' crews in what should be done or could be spent for compliance with all regulations, including the costs/fees and expenses to land shipboard wastes ashore. Accordingly, there was no pecuniary gain recognized by Liquimar as a result of the individual defendant's conduct and no evidence presented by the government to support such an argument during sentencing.[20]

---

[20] *See* 18 U.S.C. § 3571(d), which allows a Court to impose a fine based on twice the "pecuniary gain from the offense" or twice the "pecuniary loss to a person other than the defendant," but the government did not introduce any evidence quantifying such an amount during trial, and the jury was not directed to make any such determination. In *Southern Union Co. v. United States*, the Supreme Court held that the rule of *Apprendi*—that a jury must find any fact that increases the statutory maximum sentence—applies to fines imposed against organizational defendants. *See* 132 S. Ct. 2344, 2350 (2012). Under *Apprendi* and its progeny, therefore, any fact that increases either the statutory maximum or mandatory minimum constitutes "an element of a distinct and aggravated crime" that must be found by the jury beyond a reasonable doubt. *United States v. Catone*, 769 F.3d 866 (4th Cir. 2014) (citing *Alleyne v. United States*, 133 S. Ct. 2151, 2162, 186 L. Ed. 2d 314 (2013)). Based on this ruling, the jury would have been required to find any fact that would increase the statutory maximum fine imposed against Liquimar, including any amount used under the "federal twice-the-gain-or-loss statute." *Id.* at 2351-52 (citing 18 U.S.C. § 3571(d)). In short,

### D.  Disciplinary Actions Taken by Liquimar – 18 U.S.C. § 3572(a)(8)

Liquimar has already taken additional steps to ensure that no similar misconduct occurs again. In addition to the proactive measures taken prior to the jury's verdict discussed above, Liquimar made it clear to all shoreside and shipboard staff that compliance with the EMS policies and procedures, as well as, following all international laws, rules, and regulations are conditions of employment and are of utmost importance. Consistent with that approach, Liquimar will continue to review its vetting, training, and familiarization protocols in order to make sure that all staff are familiar with and will comply with the proper operation of the vessel's Oily Water Separator and associated pollution prevention equipment.[21] Liquimar has also spent a considerable amount of time, money, and effort conducting regular internal environmental audits of the fleet of five (5) vessels that it manages, including the M/T EVRIDIKI. *See* Chelios Decl., at ¶ 18. Exhibit 13. Liquimar also fired the prior DPA, hired a new DPA and Operations Manager, and created the role of Corporate Compliance Manager. In addition, C/E Vastardis is not eligible for rehire on Liquimar managed vessels in the future.

---

because the government failed to charge such conduct in the Indictment and failed to elicit such factual finding from the jury here, the Court may not impose a fine in excess of the $500,000 maximum for each count, which is the maximum established under 18 U.S.C. § 3571(c)(3). *See also United States v. Bane*, 720 F.3d 818, 830 (11th Cir. 2013) (holding that a fine in excess of the statutory-set maximum for individuals in 18 U.S.C. § 3571(b)(3) could not be imposed under 18 U.S.C. § 3571(d) because the fine was "without a jury finding" and therefore constitutionally impermissible under *Southern Union*).

[21] The expected cost of monitoring Compliance during probation is also a factor. The government has asked for the entry of *pro forma* Environmental Compliance Plan, which Liquimar believes is unwarranted under the facts and circumstances of this matter. To the extent that the Court were to impose some form of supervised probation, the Court's and Department of Probation's monitoring of Liquimar's compliance, will need to be performed by an independent expert through the appointment of a third party, Court Appointed Monitor (CAM), whose costs and fees will be paid by Liquimar and co-defendant Evridiki. It is respectfully submitted that, if the CAM requirement is imposed, these costs, fees, and expenses are properly to be considered as mitigation of any fine amount that might be imposed by the Court.

## VI.    ADDITIONAL FACTORS TO BE CONSIDERED BY THE COURT

### A.  Defendant's Inability to Pay a Fine Should Be Considered by the Court

A defendant's financial condition must be considered in determining the amount of a fine. *See* 18 U.S.C. § 3572(a) ("In determining whether to impose a fine, ..., the court shall consider, ... the defendant's income, earning capacity, and financial resources"); *see also* U.S.S.G. § 8C3.3 (providing that the amount of a fine may be reduced if an organization is unable to pay a guidelines range fine).  A court should impose a fine in an amount less than otherwise would be required where "the court finds that the organization is not able, and even with the use of a reasonable installment schedule, is not likely to become able to pay the maximum fine." *See* U.S.S.G. § 8C3.3(b). For the purposes of the guidelines, an organization is not able to pay the minimum fine, where, even with an installment schedule, "the payment of that fine would substantially jeopardize the continued existence of the organization." *See* U.S.S.G. § 8C3.3, Application Note 1.

When a court imposes a fine and determines "the amount, time for payment and method of payment," the court must consider, *inter alia*, "the defendant's income, ensuring capacity and financial resources." 18 U.S.C. § 3572(a)(1). Indeed, U.S.S.G. § 8C3.3 permits "a court to reduce a fine upon a finding that a defendant organization is not, and is not likely to become, able to pay it." *United States v. Eureka Labs., Inc.,* 103 F.3d 908, 912 (9th Cir. 1996). The imposition of a fine so substantial that it wipes out a business organization would itself be an abuse of discretion. *See Standard Oil Co. of Indiana v. United States*, 164 F. 376, 386-89 (7th Cir. 1908) ("[T]his is not the punishment of an unlawful business, but the punishment of unlawful practices connected with a lawful business. . . ").  As set forth in the financial documents disclosed to the probation department, Liquimar has very limited capability to pay a fine and it respectfully requests that the Court bear this in mind, as well as Liquimar's other obligations to be met as a result of Liquimar's cooperation with the government to fund its own prosecution and subsequent measures taken to

26

introduce and implement the EMS. It is respectfully submitted that the Court should impose an aggregate fine of no more than USD 400,000, to be paid from the funds held in the registry of the Court.

### B.  The Counts Should Be Grouped

Here, it is appropriate for the Court to group the counts for the purposes of sentencing. Grouping the counts for the purposes of determining the fine will adequately satisfy the statutory objectives and requirements of 18 U.S.C. §3553 and 18 U.S.C. §3572 and the Court's "overarching" duty to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *See Kimbrough v. United States,* 552 U.S. 85, 90 (2007); *Pepper v. United States,* 131 S. Ct. 1229, 1242-43 (2011). "The Sentencing Commission wrote its grouping provisions 'with an eye toward eliminating unfair treatment that might result from count manipulation.' U.S.S.G. Ch. 1, Pt. A, § 4(a)." *United States v. Calozza,* 125 F.3d 687 (9th Cir. 1997); *see also United States v. Bush,* 56 F.3d 536, 538, 1995 U.S. App. LEXIS 14458, *4-6 (3d Cir. 1995) (wherein the Third Circuit explained that the practice of grouping is to "prevent multiple punishment for substantially identical offense conduct, while still ensuring incremental punishment for significant additional criminal conduct")(internal quotations omitted).

When a defendant is convicted of multiple counts, courts are required to determine whether the counts arise from the same act or transactions and, therefore, "grouped" for the purposes of sentencing. *See* U.S.S.G. §§ 1B1.1(d), 3D1.1(a), 3D1.2; *see also United States v. Wessells,* 936 F.2d 165, 168 (4th Cir. 1991); *United States v. Patterson,* 962 F.2d 409, 417 (5th Cir. 1992). Specifically, for counts involving the same acts or transactions connected by a common scheme or plan, or which involve the same harm, grouping ensures convictions for such acts will not result in the imposition of an inappropriately harsh sentence. *See* U.S.S.G. § 3D1.2(b); *see also Calozza,* 125 F.3d at 692. Accordingly, grouping seeks to ensure that convictions on multiple counts do not

result in a sentence enhancement unless the multiple counts represent additional conduct that is not otherwise accounted for by the guidelines. *Id.* Here, a failure to group the counts would result in an unfair enhancement.  There is no additional conduct which is not accounted for by the guidelines.

For both Count One a violation of 33 U.S.C. § 1908(a) and Count two a violation of 18 U.S.C. § 1519, Liquimar was held vicariously liable for ostensibly the same conduct, namely that the Oil Record Book was falsified by omission by shipboard staff.  *See* Doc. 1, pp. 4-6.  The exact same underlying offense conduct was alleged in both counts and specifically are a result of maintenance and presentation of the inaccurate Oil Record Book to the Coast Guard during the Port State Control Inspection on or about March 11, 2019.  With respect to Count Three, 18 U.S.C.§ 1505, the allegation is that the Defendants obstructed the Coast Guard inspection by (a) presenting an Oil Record Book that falsely reported the required pollution prevention equipment had been used properly when discharging bilge water and (b) Vastardis ran the sample line in a closed position and (c) Vastardis falsely stated the valve was "open" during at-sea operations. *Id*. at pp. 6-7.  With respect to Count Four, a violation of 18 U.S.C. § 1001, the government charged the same false statement by C/E Vastardis under a separate statute.  Accordingly, it is respectfully submitted that it is appropriate for the Court to group the offense conduct for the four (4) charges together (or at least group counts 1-2 and 3-4 together) when determining the proper amount of a fine, if any, to be imposed.  Implementing the grouping standard, it is respectfully submitted that a maximum fine of $200,000 (*i.e.* of $100,000 for each of the grouped counts) would be proper and appropriate under the facts and circumstances of this case.

## VII.   UNSUPERVISED PROBATION

Liquimar submits that if the Court were inclined to impose a probationary sentence; no more than a one (1) year term of unsupervised probation would be sufficient and not greater than

necessary under the circumstances of this case. It is respectfully submitted that due to the delay caused by COVID-19, Liquimar has already been operating as if it was on probation for the last three (3) years. Such a result is further warranted and appropriate here, given the fact that many similarly situated organizational defendants successfully move for early termination of probation around the 24 – 36-month mark. *See e.g., United States v. Kassian Maritime Navigation Ltd*., 3:07-cr-00048, Dkt. 153 (MDFL Nov. 5, 2009) (granting termination of probation after 24 months of 30 month sentence); *United States v. Tyana Navigation, Limited*, 2:12-cr-290, DE 21 (EDLA June 8, 2015) (granting termination of probation following 30 months served of 36 month term of probation); *See, e.g. United States v Navimax Corporation,* 18-CR-86-MN (D. Del. 2018) (motion for early termination of probation pending and unopposed by the government).

## VIII.   NO SPECIAL TERM OF PROBATION OR FURTHER ECP IS WARRANTED

While the government will request that the Court impose an ECP, it is respectfully submitted that it would be "a step backwards" to seek to impose a new system which may be "different," but is not demonstratively or substantively "better" in this case. It is respectfully submitted that District Courts (including in this District) have reviewed similar EMS programs voluntarily instituted by similarly situated organizational defendants; such plans have been approved and no further ECP was required. *See, e.g. United States v Navimax Corporation,* 18-CR-86-MN (D. Del. 2018) (DI 11 - Environmental Management Augmentation Plan approved); *United States v Diana Shipping*, 13-CR-40-MSD (E.D. Va. 2013) (DI 162-Enhanced Environmental Management System approved).

Following the initiation of the U.S. Coast Guard investigation that led to the prosecution of this case and continuing throughout 2019, Liquimar took and continues to take substantive and proactive steps to strengthen its on board and shoreside operations and EMS for its managed fleet. The EMS has been reviewed by an independent third-party auditor who certified that Liquimar's

environmental management system is ISO 14001 compliant. It is respectfully submitted that the environmental system in place which meets the ISO 14001 standards should be taken into consideration by the Court.

In contrast, the government's proposed ECP submitted with the government's objections to the initial Pre-sentence Report, is a generic compliance program that is not tailored to Liquimar's operations, personnel, or vessels. The government proposed ECP is not nearly as comprehensive or robust as the EMS, revised SMS, BWMP, and/or the updated Environmental Policy and fails to consider the nature of Liquimar's fleet, the types of vessels it operates, the structure of its crewing, technical management, and health, safety, quality and environmental (HSQE) departments. Similarly, while the government proposed ECP calls for Liquimar to implement engineering requirements on its vessels, revise its training protocols, implement an open reporting system, adopt a protocol for reviewing entries made in the vessels' Oil Record Books, etc., these steps have already been successfully implemented by Liquimar. Accordingly, it would be entirely inefficient and contrary to the public's interest to "scrap" the existing ISO 14001 compliant EMS, which is in use and under which the Liquimar personnel have been, and continue to be, trained and successfully operating, in favor of a generic ECP that is not as comprehensive and will require implementation of some, but not all, of the elements of the EMS and will further require the Liquimar personnel to be re-trained to meet the less comprehensive mandates of the government proposed ECP.  Such a situation will necessarily result in an exercise of pure inefficiency and confusion.

Should the Court impose a special condition of probation, Liquimar respectfully requests that the Court continue to permit it to operate pursuant to the EMS, with compliance being audited, determined, and reported by a Court Appointed Monitor (CAM). Once appointed, the CAM will be provided a period of thirty (30) to sixty (60) days to review the Liquimar EMS and recommend

to the Court what additional measures may be helpful (if any). Liquimar respectfully submits no further action is necessary or appropriate and any further requirements would be greater than necessary.

## **CONCLUSION**

For the reasons discussed above, Liquimar requests this Honorable Court group the counts of conviction and impose a modest fine of no greater than USD 100,000 per count for an aggregate fine of no more than USD 200,000 – to USD 400,000. Liquimar also respectfully submits that the Court should impose a term of unsupervised probation of no more one (1) year.  Finally, Liquimar submits that the implementation of a new and/or different, but not necessarily "better" ECP is unwarranted and, conversely will serve to undermine and delay the remedial measures already implemented by Liquimar.  It is respectfully requested that the Court approve and adopt the EMS already implemented, as amended, as a condition of probation, and such other and further relief as may be just and equitable under the facts and circumstances of this case.

Respectfully submitted,

Date: April 20, 2022                                CHALOS & Co, P.C.


/s/ George M. Chalos
George M. Chalos
Briton P. Sparkman
55 Hamilton Avenue
Oyster Bay, New York 11771
Telephone:     (516) 714-4300
Facsimile:      (516) 750-9051
Email:  gmc@chaloslaw.com
              bsparkman@chaloslaw.com

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on April 20, 2022 arranged for a copy of the foregoing Memorandum in Aid of Sentencing to be served via cm/ECF for the United States of America, as follows:

       <u>*Attorneys for United States of America*</u>

       Environmental Crimes Section
       U.S. Department of Justice
       P.O. Box 23985
       L'Enfant Plaza Station
       Washington, DC 20026-3985
       Richard A. Udell
       Richard.udell@usdoj.gov
       Kenneth Nelson
       Kenneth.Nelson3@usdoj.gov

                       /s/ George M. Chalos
                       George M. Chalos
                       Briton P. Sparkman