**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Case No. 19-66-RGA** |
| **v.** | ) | |
| | ) | **GOVERNMENT'S MEMORANDUM** |
| **EVRIDIKI NAVIGATION, INC.,** | ) | **IN AID OF SENTENCING** |
| **LIQUIMAR TANKERS** | ) | |
| **MANAGEMENT SERVICES, INC.** | ) | |
| **Defendants.** | | |

## INTRODUCTION

The United States, by and through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing regarding the corporate defendants, Evridiki Navigation, Inc. (Evridiki), and Liquimar Tankers Management Services, Inc. (Liquimar).

Defendants[1] were convicted of all counts at trial and have refused to fully accept responsibility. Defendants' sentencing memoranda narrowly construes and inaccurately defines their intentional and willful misconduct. The offenses of conviction were extremely serious and reflected management failures in addition to corporate criminal liability for the intentional acts of crew members. Even more significant is the substantial evidence of uncharged corporate malfeasance and fraud committed by shore-based personnel at the highest levels of the company. The failure to address, let along mention this willful misconduct, demonstrates that these defendants are willfully blind if not completely unrepentant.

After trial, the United States submitted sentencing options and a draft Environmental Compliance Plan ("ECP") appropriate for this case. In contrast, defendants, who raised numerous obstacles to the investigation and prosecution, and strenuously protested their culpability as well

---

[1] The United States is filing one sentencing memorandum and refers to the closely related defendants collectively.

as the verdict, and have proposed exceptionally lenient sentences outside the heartland of most similar maters. Defendants are asking this Court for nothing less than a *trial discount.* Defendants seek a sentence that would be substantially more beneficial than the terms imposed on defendants that have pleaded guilty and fully accepted responsibility.

The government has attached the declaration of James Dolan, the government's expert that testified at trial. *See* Exhibit A. Mr. Dolan has extensive expertise, was present for trial, has reviewed the sentencing submissions, and has also examined the declarations of Special Agents Frith, Vachon and McKnight and supporting documents. *See* Exhibits B, C and D. These declarations show that corporate managers made and sent to the ship fake Oil Content Meter ("OCM") calibration certificates. Two of these forged documents were used during the inspection of the M/V Evridiki in Delaware. The declarations are summarized in the Pre-Sentence Reports. *See* Doc. 188 at 12-15, para. 35-45. Based upon his extensive and experience, Mr. Dolan supports the options outlined by the government in response to the Court's Order Doc. 187.

In the event that defendants are not banned outright from trading in U.S. ports and waters, Mr. Dolan views the maximum period of probation (five years) as best to protect the public from further crimes of these defendants and to ensure that the defendants receive needed correctional treatment. Based on his auditing and monitoring experience, Mr. Dolan firmly rejects defendants' prayer that they simply be allowed to monitor themselves. As set forth therein, Mr. Dolan recommends a five year term of probation subject to the terms of the ECP submitted by the United States, which includes independent audits by a Third Party Auditor ("TPA"), and supervision of probation by a Court Appointed Monitor ("CAM").

## Characteristics of the Defendants

Defendants Evridiki and Liquimar are respectively the owner and operator of the M/T Evridiki. They are co-located at the same address and appear to be organized in the same manner

as many other shipping companies, especially those in Greece. Liquimar manages a fleet of tankers each of which, like the *M/T Evridiki* is owned by a corporation whose only asset is the vessel. Liquimar PSR at 7, Doc. 188.[2] Under the terms of the management agreement between Evridiki and Liquimar, Liquimar was responsible for hiring the crew, providing technical management (including competent personnel to supervise the maintenance and general efficiency of the ship) and providing commercial operation of the ship. Doc. 188 at 8. As the operator of the other vessels in its fleet, Liquimar performs the same tasks. While Liquimar was paid a management fee by Evridiki (and by the other ship owners), the PSR states that "the actual relationship, including corporate organization, common ownership and control is not known." *Id.*[3]

It is industry practice that investors and owners attempt to insulate themselves and their assets from liability by creating numerous entities and shell corporations.[4] Defendants' response to the PSR is anything but transparent. *See e.g.,* Doc. 188 at 4-5, n.1-3. Defendant Evridiki informed probation of its address as "c/o Liquimar" in Athens. Letter from Chalos and Sparkman to the Office of Probation dated March 5, 2020, with questionnaire. According to the form submitted to the Probation Officers, Evridiki has two corporate officers, a President and a

---

[2] All references to the PSR are to the Liquimar PSR unless separately indicated.

[3] Both Evridiki and Liquimar disagree with this conclusion and its relevance, Doc 188 at n.3; Doc 189 at n.3, but neither has provided the Probation Office with the information sought in the government's trial subpoena or otherwise made their organization transparent to the Court.

[4] The government sought to obtain such information pursuant to trial subpoena. Defendants' moved to quash the government's trial subpoena and refused to provide a custodian of records and records for trial in contravention of the Agreement on Security between defendants and the Coast Guard. Subpoena demands 1 through 5 sought basic information about the ownership, offices, and relationship between the entities including corporate officers and directors, percent of ownership, and whether either defendant had an ownership interest in the other corporate defendant. The organizational defendants characterized these requests as a "fishing expedition" contending that "[t]hese improper and objectionable requests seek private information of irrelevant third-parties and individuals who are not involved in to this case and not subject to the subpoena powers of the Court." Doc. 107 at 7.

Secretary, neither of which owns any shares in the company. *Id*. No shareholders have been identified. Evridiki has no employees. *Id*. at 7. In its Closing Statement, Evridiki defended the case by reference to the "BIMCO" contract between Evridiki and Liquimar as "a true contract between two third parties." Doc. 160 at 123. Evridiki provided the Office of Probation with the name of a corporate representative different from Liquimar's, just as it presented the jury with two corporate representatives. The corporate representative identified to the Office of Probation was the same one that attended trial and was introduced to the jury in Evridiki's opening statement. What the jury was not told is that the person who appeared each day as Evridiki's corporate representative was actually a Liquimar employee.

Defendant's statement that "[t]he vessels are owned by separate and distinct companies," Doc 188 at n.3, may be technically true in some way, but it is misleading in this context. The purpose of this type of corporate organization is to avoid liability and oversight. *See* G. Vuillemey "Corporate Irresponsibility in the Shipping Industry: A Dark Side of Global Trade" (Sept. 27, 2020) (available at: https://voxeu.org/article/corporate-irresponsibility-shipping-industry) (last viewed April 25, 2022) (Maritime firms register each ship in a different one ship subsidiary as part of an effort to systematically structure their organizations in order to avoid liability).[5]

The United States is not seeking to determine at sentencing the complex web of corporate relationships that defendants have endeavored so hard to conceal. Rather, the points above stand in support of the Office of Probation's finding that "the actual relationship, including corporate organization, common ownership and control is not known." Doc. 188 at 8. It is therefore reasonable to conclude that the defendants are closely related entities, and that they are part of a

---

[5] *See* G. Vuillemey, "Evading Corporate Responsibilities: Evidence from the Shipping Industry" (available at: Limited_Liability_and_Flag_States (26).pdf (cepr.org) (last viewed April 25, 2022).

larger organization that own and control the fleet of vessels managed by Liquimar through common owners, officers, and subsidiaries. The fact that the actual relationship between the ship owners and operator is unknown – as is the relationship of the defendants to the other ships and ship owners – is relevant for sentencing because it illustrates that the financials submitted to probation lack veracity and/or verifiability. While there are two corporate defendants, and each should be allocated a separate fine in order to obtain a result that will deter these defendants and others, they are part of a larger group of entities whose finances, assets and relationship have not been fully disclosed.

In the government's view, the most important characteristics of the organizational defendants for the Court to consider at sentencing are the following:

- Defendants did not have an effective ethics and environmental compliance program at the time of the offense. Defendants' conviction represents a management failure and was not limited to the shipboard misconduct of one Chief Engineer as they continue to suggest.

- Defendants contested the evidence and their criminal culpability during trial, in post-trial motions, in response to the PSRs, and in their sentencing submissions. Defendants continue to minimize their misconduct and have demonstrated little or no remorse.

- Defendants' misconduct involved willful criminal conduct by shore side managers, a fact that defendants have failed to acknowledge or address in their sentencing submissions. The failure to do so raises profound questions about corporate culture and commitment to change.

### **Acceptance of Responsibility**

Liquimar and Evridiki seek to minimize the *offense conduct* by describing it as unknown, unwanted and strictly prohibited misconduct by defendant Vastardis that is not reflective of the history and characteristics of Liquimar. *See, e.g.*, Doc. 190 at 16. Liquimar contends that "the misconduct concerning the inaccurately recorded operations was limited in scope and time." *Id*. at 16-17; Doc. 192 at 9.

The evidence proves otherwise. The misconduct was broader in scope and time than defendants begrudgingly admit. Even defined narrowly, the offense conduct represents corporate managerial failures to prioritize environmental compliance. As summarized in Mr. Dolan's declaration:

> Liquimar also states in their memorandum that the misconduct was limited in scope and time. However a review of government trial exhibit #53, which is based on the OCM recordings for these dates, provides a very strong indication that the last time the OCM alarmed at over 15ppm was on January 5, 2018. Given normal operating conditions, and the state of the bilge tanks and OWS filters discovered at the time of the detention in Delaware, this doesn't make sense. What it does infer is that the lower valve in the sampling line, or some other method of tricking/bypassing of the OCM, was in continuous use from January 5, 2018 to the U.S. Coast Guard inspection in March 2019. This time period includes at least one other Chief Engineer. This means that it was either not discovered or it was ignored by any ship visits by Liquimar Superintendents or third parties such as Flag, Class or SIRE surveyors.

Dolan at 5, para. 13.

The intentional falsification of the oil record book and improper discharges took place over more than a year and involved at least two Chief Engineers.[6] It also bears mentioning, especially because defendants stress they are "only" vicariously liable for the acts of ship officers, that Chief Engineers are a rather exalted position within a maritime company. They are rewarded the highest levels of compensation on par with Captains and entrusted with the company's multi-million dollar investment. Even if that were the extent of defendants' misconduct, that alone would be very significant.

Liquimar's own Non-Conformity Report and Root Cause Analysis, prepared in response to the ISM Audit report required by the Coast Guard, found management responsibility that was not limited to the acts and omissions of the crew. Exhibit E. For example, Liquimar was required to identify root causes and admitted that the company's procedures and instructions for the

---

[6] It is not known whether the other Chief Engineer remains employed on Liquimar vessels.

6

maintenance, cleaning, testing and operation of the OWS "were not adequately detailed, thus not ensuring the proper maintenance, cleaning and operation of the OWS system, including the filters." Exhibit E at 3. The onboard training was "ineffective." *Id*. The bilge tanks and filters were not being cleaned with sufficient frequency. *Id*. And, Liquimar's preventative maintenance program allowed for "excessive" intervals for the overhaul, maintenance and cleaning of the OWS. *Id*. at 6.

Reminiscent of Liquimar's opening and closing statements, both companies continue to assert, and have submitted a declaration boasting, that the Evridicki was and is exceptionally well maintained, the crew friendly, and that it has an unblemished record of inspections. Mr. Dolan rejected these assertions in his trial testimony and now declares:

> Liquimar in their memorandum in several places refers to the U.S. Coast Guard officers who inspected the vessel as well as the undersigned using selective testimony to emphasize that the vessel was well maintained, that the crew was helpful, that there was no illegal bypass, and there was no discrepancy between the ORB and the sounding logs. While this testimony is generally correct, none of this deflects from the fact that the Chief Engineer tried to manipulate the sample to the OCM during the U.S. Coast Guard test of the OWS system, or that the company and the ship used fake documents to try and fool both U.S. Coast Guard Inspectors and a BP vetting inspector. To me it is simply evidence of a well-developed and thought out effort to minimize and deceive.

Exhibit A at 6, para. 16. Mr. Dolan further observes that is not especially significant that the ship had, or now has, a record of not being detained given the "clever" way in which the misconduct was conducted and concealed. *Id*. at 4, para 12 ("All of this is to say that 1) it is not surprising that the shipboard and shore side misconduct was not previously discovered; 2) had the true facts been known, neither the owner, operator nor the ship would have had an unblemished record; and 3) whether there is similar non-compliance on other ships in the fleet is unknown.")

And yet, Mr. Dolan explains that "[e]ven though the problems with the OWS and tricking of the OCM sensor would not normally have been discovered in a routine inspection, *it would not have been difficult or impossible for diligent management to discover*." *Id*. at 5, para 14 (emphasis

added). In other words, the failure to properly maintain the OWS, failure to properly clean the bilge tank and OWS filters, the failure to train crew, were all problems indicative of management failures that would not have taken place had Liquimar been well-managed and prioritized environmental compliance. Minimizing the nature and scope of its misconduct, and blaming one bad apple, reflects poorly on defendants' current understanding of its problems and commitment to compliance.

Defendants have asserted that they have taken various remedial measures, but, as noted by Mr. Dolan, they "do not address some of the more significant challenges that are known to exist." *Id*. at 7, para 18. "Changing procedures, firing an individual and hiring a third-party auditor are all good steps, but if the company never gets to the root cause all will be in vain. All ISM Safety Management systems can be circumvented by ship's engineers and responsible office individuals without third-party auditors reporting solely to the company detecting deficiencies." *Id*.

## The Elephant in the Room

As mentioned at the outset, there is strong and especially concerning evidence showing that senior corporate managers, including the company's Designated Person Ashore ("DPA) were personally involved in serious misconduct, including apparent uncharged violations of U.S. law related to the fabrication of false and forged environmental and safety certificates. *See* Exhibits B (SA Frith), C (SA Vachon) and D (SA McNight). The substance of these declarations and their attachments are summarized in the PSR, Doc. 188 at para. 12-14, para. 35-45, and by Mr. Dolan. Exhibit A at 2-4, 6, 7-8, para. 5-11, 15, 19. "In summary, and in addition to the other evidence introduced at the trial, there is clear evidence that both shipboard crew and Liquimar supervisors deliberately tried to deceive Port and Flag State Inspectors and SIRE vetting inspectors in the course of inspections by making and using fake certificates." Exhibit A at 3, para 8.

The memoranda in aid of sentencing submitted by the corporate defendants have not provided any contrary information to challenge the agent declarations and the summary of them in the PSR. The defendants have had a substantial amount of time to investigate, respond and address these issues, but neither their sentencing memoranda nor Captain Chelios' declarations even mention the proverbial "Elephant in the Room."[7] Agent Frith's forensic exam and the authenticity of the records found on the ship's computer and described in his declaration are apparently not in question. Even so, the government has attached Agent Frith's curriculum vitae to satisfy any questions that may arise regarding his qualifications. Exhibit F.[8] Similarly, the authenticity of the documents obtained from British Petroleum ("BP") pursuant to subpoena, and the assertions of their personnel as set forth in the sworn declarations, including the fact that Liquimar was banned, have not been questioned.

When they received the PSR more than two years ago, defendants effectively argued that even if they forged fake OCM certificates, it would not be relevant for the Court to consider and should be excluded. The government begs to differ since the charges in his case include obstruction of a Coast Guard proceeding and *two of the fake certificates in question were used during that same inspection in Delaware and for the same overall purpose*. The motive for defendants'

---

[7] In objections to the PSRs, the organizational defendants made the following arguments: (1) the emails from a BP inspector have nothing to do with the conduct charged and should be ignored in its entirety; (2) there is no evidence that the reason BP banned Liquimar was based on the ORB or entries therein; (3) the alleged BP conduct has nothing to do with the offenses and is thus not "relevant conduct" under the sentencing guidelines; (4) the allegations included in the PSR are "unfounded, improper and wholly irrelevant." Doc. 188 at 12-15 and n.14-16.

[8] The United States intends to rely on Agent Frith's declaration. He will not be attending sentencing because he is in an exam period while finishing up a program at the University of Louisville. However, should the Court have any questions about his declaration or the computer search, he will be available by telephone or VTC. Another agent will be available to swear to the declarations if the Court determines that is necessary.

obstruction was to pass inspection and obtain a Certificate of Compliance necessary to do business in the United States.

That said, the Court need not dwell on this legal fine point since clearly the falsification of environmental and safety documents by senior managers is highly pertinent for determining what remedial measures are necessary to protect the public, achieve deterrence, and provide correctional treatment as required by Section 3553. The facts concerning the making and use of fraudulent certificates has no bearing on a sentencing guideline calculation of an individual as was at issue in *United States v. Abrogar*, 459 F.3d 430 (3d Cir. 2006). Instead, it is being offered because it is highly pertinent to determining an appropriate sentence for a corporation whose maximum sentence is fixed by the number of the counts of conviction. In addition, the fake certificates were actually used in the United States during a Port State Control inspection. These facts are additionally relevant to considering appropriate remedial measures such as those discussed in Chapter 8 of the Sentencing Guidelines. Defendants' side-stepping the Elephant in the Room is itself sobering evidence of their failure to accept responsibility and take needed remedial measures.

As observed by the government's expert, the involvement of shoreside management in falsifying documents presented to the Coast Guard and other authorities is especially egregious:

> This case is different from the majority of similar matters of which I have knowledge because there is direct evidence of shore side involvement. The discovery that Liquimar management was involved in making fake OCM calibration certificates for the OWS is particularly serious because it suggests willful misconduct, rather than just mismanagement, lack of training, or inadequate procedures. The company will need to understand and address this if it is to move forward.

Exhibit A at 6, para 15.

## Misconduct by Management

The government will not here repeat all of the issues and evidence set forth in the three agent declarations. However, we offer a few examples that may assist the Court.

In March 2018, during the course of a BP "vetting" inspection the crew was asked to provide a calibration certificate for its OCM. It took 6 hours for the crew to provide a certificate to BP. That certificate, dated October 12, 2016, was fraudulent. *See* Liquimar PSR at para 38. It represented the testing of an OCM with a different serial number than the one actually in use on the ship. The crew was unable to explain why the serial number did not match. After failing BP's vetting inspection, a new and also fake OCM calibration certificate was sent to the ship. *See* Exhibit B at 2-7, Exhibit C at 2-3, and attachments. According to the digital evidence, this new OCM certificate *was created on a computer associated with the username D. Liveris*. *Id*. at para. 40. Dionysios Liveris is the Liquimar corporate representative that was present at counsel's table in the courtroom during trial. The metadata for this PDF further shows that it was created on April 12, 2018, and sent to the vessel as an attachment to an email string dated April 23, 2018. It is not known whether Mr. Liveris is still employed by Liquimar where he worked for several decades.

The same BP inspection also documented a fake safety related document. *See* Exhibit B at 37, and attachments. In sum and substance, the BP inspector wrote an internal report that expressed the view that a certificate claiming that certain pressure tests had been performed was fake because one of those tests could not be conducted with the tank loaded with oil. The inspector also doubted subsequent Liquimar's response claiming that personnel had visited the ship and actually performed the test since that was not reflected on the ship's security log where individuals boarding the ship must be recorded. Mr. Dolan reviewed the documentation regarding this particular incident and concluded that "[t]he falsification of this safety test shows a disregard for safety of the crew and the ship and represents a major management failure." Exhibit A at 4, para 10.

Based on the results of the vetting inspection, BP determined that Liquimar and the Evridiki did not meet its standards and that it would be banned for one year, after which it could apply for another vetting inspection. *See* Exhibit B at 2-3, Exhibit C at 2-3, Exhibit D at 2-3 and attachments.

Liquimar's General Manager and DPA at the time appealed BP's decision. BP refused to back down. An internal Liquimar email from the General Manager and DPA to the Master of the Evridiki registered his displeasure the BP inspector writing: "THERE ARE INSPECTORS WHO HAVE BEEN TRANSFORMED BY AUTHORITY AND EASY MONEY, BUT THIS GREEK WAS NOT." Exhibit B at 3, para 7 and Exhibit B contained therein.

Defendants' joint expert, Captain Chelios, indicates the prior DPA was fired, but his declaration does not indicate why, nor does his declaration inform that Court whether he understands the nature and scope of the company's misconduct as discussed above. It is critical that defendants with this unfortunate history face up to the full scope of their misconduct and understand its root causes. See Exhibit A at 8, para 19.

One year later, on March 11, 2019, the Coast Guard was provided with an OCM certificate dated January 11, 2019 during the inspection in Big Stone Bay. *Id*. The 2019 certificate was issued by Autotech, a supposedly independent company (albeit one that is not approved by Deckma, the OCM manufacturer). Copies of a digital image of this certificate with the third-party's stamp (Autotech) were found on the ship's computer by Agent Frith. Exhibit B at 7. His forensic exam of the file and related documents show that this certificate was actually emailed to the ship by Liquimar. *Id*. During the inspection in Delaware, the Coast Guard questioned this certificate because the recorded OCM history showed that the OWS was not turned on that day as would have been necessary in order to conduct a calibration test. *See* Doc. 188 at 13-14, para 41. The use of this false record during the same Coast Guard inspection, had it been understood at the time of indictment, could have been charged under various criminal statutes including 18 U.S.C. §§ 371, 1001, 1505 and 1519.

The two certificates in use during the Coast Guard's inspection in Delaware were not the only OCM certificates found on the ship's computer. For example, as described in Agent Frith's

declaration, including as displayed in the powerpoint slides showing the fake certificates (E) thereto, Evridiki's computer was found to have various "Autotech" certificates with the name of the same service technician (D. Stratakias). Exhibit B (and Exhibit E to SA Frith's declaration). However, even a cursory review shows that the signatures on the 2018 and 2019 certificates are different. *Id*. Moreover, SA Frith found a separate digital file that could be used to affix Autotech's blue rectangular stamp on any document. *Id*. This file is known as a as a "pencil mark" and was used to make comments on an Adobe file. *Id*. The signature can be manipulated or placed in a different location. *Id*. An examination of this particular pencil mark signature shows that it is associated with the computer of "E. Garoutsos." *Id*. Other company records list Evangelos Garoutsos as a Liquimar superintendent. *Id*. It is not known if Mr. Garoutsos remains employed by Liquimar.

As observed by Mr. Dolan, the presence of a digital stamp provided by the company allowed for easy falsification of documents that would normally be presented to those whose attendance on board was to verify compliance with international regulations. "Stamped documents are relied upon by Flag and Port State inspectors, classification surveyors, International Safety Management (ISM) auditors and SIRE inspectors. This reliance goes to the heart of confirming compliance and the acceptance of vessels under the international regulations, SOLAS and MARPOL." Exhibit A at 3, para 7.

### Seriousness of the Offenses

Defendant's crimes are unfortunately not unique. Significant criminal enforcement actions have been brought in every judicial district with a major commercial port against companies that own and operate virtually every type of vessel including cruise ships, oil tankers, bulk carriers, container ships, and tugs and barges as well as senior ship officers, engineers and shore-side managers.

Combatting ocean pollution is a collective action problem and success requires the cooperation of many nations including the United States. MARPOL has been the international community's solution to this problem, and this treaty has been implemented in the United States by the Act to Prevent Pollution from Ships (APPS). Recordkeeping requirements and inspections of those records are not mere formalities. Because most illegal dumping occurs on the high seas beyond the eye of any watchful authority, inspection of ship records are often the only viable means of enforcing this important international treaty. When unscrupulous companies and employees deliberately dump oil-contaminated waste into the ocean and then subvert MARPOL and APPS by creating false documents to conceal their misconduct, it seriously undermines the effectiveness of the federal and international ocean pollution prevention regimes and creates an uneven playing field where other companies that pay the costs of waste disposal are economically disadvantaged.

Defendants were not only convicted of falsifying the ORB, they were also convicted of obstruction of justice, false statements, obstructing an official U.S. Coast Guard proceeding that they requested take place in order to obtain the paperwork necessary to engage in U.S. commerce. The U.S. Coast Guard is out there every day inspecting ships to ensure that they are in compliance with the law and that they do not pose a danger to United States' ports and waterways and the environment.

Defendants' attempt to minimize obstruction of justice as a mere recordkeeping offenses is repugnant and represents a failure understand the seriousness of their misconduct and accept responsibility. When a ship comes to the United States to engage in commercial operations to make money, it can only do so if the people onboard the ship, and the people in the home office, are honest about the operation and condition of the ship. Here, they lied, deceived and obstructed. In so doing, defendants not only undermined the regulatory system and those who work so hard to

protect the public safety and environment, but they sought a financial advantage over competitors who budget and pay the costs of environmental compliance. Defendants' deliberate and intentional obstructive acts undermine the rule of law. If it wasn't for the integrity and grit of the U.S. Coast Guard inspectors, these defendants would still be engaging in illegal discharges, cutting corners, and cooking the books.

## Sentencing Recommendation: Criminal Fines

The United States respectfully recommends that both defendants should be sentenced to a substantial criminal fine. The fine should reflect the seriousness of the four counts of conviction as well as defendants' failure to accept responsibility, and related conduct. A substantial fine is needed to promote respect for the law, deter this defendant, and deter others. Defendants committed these crimes in the face of the well-known and long history of many similar prosecutions. They were not deterred. A substantial fine is particularly appropriate because these defendants continue to minimize and mischaracterize their misconduct, and because the conduct directly and indirectly involved shore based management. The organizational defendants have doubled down on this unfortunate position in their latest filing asserting that the information set forth in the declarations of Special Agents Frith, Vachon and McKnight "have less weight and relevance now…." Doc. 195. In fact, the opposite is true, the facts set forth in the government's declarations carry even greater weight and relevance *because* defendants have ignored these facts, falsely claimed they are irrelevant, failed to investigate and remediate the problems posed by management involvement in criminal activity, and remain unrepentant and without remorse. This response supports the maximum, not the minimum. Accordingly, the United States respectfully urges the Court to impose the maximum fine of $2,000,000 per defendant.

Of the many factors that the Court should consider when imposing a fine is whether the fine amount would create an unwarranted disparity as compared to other similarly situated

defendants. Defendants openly seek a minimal sentence have asked this Court to sentence them to a fine far lower than other vessel pollution case of which the government is aware. The government has provided a chart showing corporate fines and the length of probation imposed on corporate defendants in other vessel pollution cases. *See* Exhibit G.[9] Criminal fines have ranged from hundred thousand dollars to tens of millions of dollars. Defendants' proposed amounts would be at the lowest end of the spectrum which would be unwarranted given the nature and scope of the misconduct, minimization, lack of remorse, and failure to take meaningful corrective action.

As the Court is acutely aware, each case is different and fines are often reflective of the particular circumstances presented by the uniqueness of each case. In some instances, a lower amount may have been agreed upon because the corporate defendant promptly admitted guilt and sought a pre-indictment plea. Some have also cooperated with the investigation. DOJ policy emphasizes that consideration should be given to corporations that provide genuine and meaningful cooperation. In other instances, fine amounts are reflective of the relatively limited amount of chargeable and/or relevant conduct, (e.g., length and number of chargeable violations), or conversely, a long period of misconduct on many vessels. Some of the largest fines involve conduct that spanned long periods of time, multiple ships, or required resolution is multiple judicial districts. In *U.S. v. Pacific Carriers Ltd.*, 4:20-cr-87, 90 & 98 (EDNC 2020), the conduct spanned three judicial districts and involved more than one vessel. The defendant in Pacific Carriers cooperated and took responsibility. They were fined $12,000,000 and ordered to implement an ECP as a special condition of a 48-month period of probation.

---

[9] The government is continuing to fact check and refine this chart and may provide an updated version at sentencing. This chart does not include older cases, some of which . It also does not indicate additional fines or modifications of probation were a defendant was found in violation, or where a defendant moved for early termination.

In *U.S. v. Aegean Shipping Management, S.A.*, 2:16-cr-134 (D.SC 2017), the owner and operator of the vessel were indicted on five felony counts including violating APPS and obstruction, similar to this case. Before trial, Aegean entered into a plea agreement with the government. The government agreed to drop three counts as to Aegean (the operator) and all counts against the owner. Aegean agreed to pay a criminal penalty totaling $2,000,000, implement an ECP and serve 36 months of probation. The difference here is that two companies were convicted *by a jury* of four felony counts each and they continue to minimize their misconduct and turn a blind eye toward even more serious corporate malfeasance by senior company personnel.

The management of this vessel knowingly caused the M/T Evridiki to enter U.S. ports and waters knowing that that it had false and fictitious certificates that would be relied upon by the U.S. Coast Guard. The defendants requested the Certificate of Compliance exam knowing of the false certifications and so they could do business and pursue profits in the United States. Defendants made a calculated gamble that they would not get caught. Defendants then made another calculated gamble of going to trial knowing that the maximum exposure based on the four count indictment was $2,000,000 per defendant ($4,000,000 combined).

In view of the lack of transparency concerning the corporate structure and relationship between the companies, there is no proven inability to pay. The suggestion that defendants should get some discount because (a) they have expended money to improve compliance; and/or (b) because they paid some $400,000 to pay their crew during the pendency of the investigation should be given no weight. With regard to the former, those are funds that defendants saved and should have been expending all along. With regard to the expenses caused by the investigation, they were caused by defendants' criminal conduct. Moreover, defendants are members of an insurance "club" that have paid or shared the cost of defending this matter. By entering into the Security

Agreement with the Coast Guard, defendants got something far more valuable – they got their ship back and were able to continue sailing and making money.

<strong>Sentencing Recommendation: Length and Conditions of Probation</strong>

The government recommends a five year period of probation subject to the ECP prepared and submitted by the government.[10] The United States is strongly opposed to defendant request[11] consisting of the shortest period of probation allowed by law (1 year), and no Court supervision. Both proposals are unwarranted and unwise. Neither would not achieve the goals set forth in Section 3553 and Chapter 8 of the U.S. Sentencing Guidelines. In fact, defendants' proposal would

---

[10] The government is mindful that in two recent cases similarly situated defendants represented by the same defense counsel as in this case have made changes such that they no longer have any vessels subject to an agreed upon ECP and Special Conditions of Probation.

[11] In February 2020, the United States, submitted three options for the Court to consider for sentencing the corporate defendants:

Option 1: Banning of all vessels owned, operated, or managed by the corporate defendants from calling on any U.S. port for the duration of the period of probation.

Option 2: Banning all vessels owned, operated, or managed by the corporate defendants for a fixed period of years that is less than the full period of probation, with U.S. operations to resume only after certain requirements have been met, with future operations during the remaining years of probation to be subject to special conditions. Such conditions could include the following:

    a. an independent investigation into the root cause(s) of the offense and other relevant conduct (specifically, the making and use of false and invalid vessel certificates by management); and

    b. proof of the development, implementation and funding of an Environmental Compliance Plan subject to Court and/or government approval, and which includes independent underway audits of every vessel by a Court approved third-party, and independent verification by a Court Appointed Monitor prior to any next arrival in the United States.

Option 3: Require the development, implementation, and funding of a rigorous Environmental Compliance Plan ("ECP") consistent with sentencing policies set forth in U.S.S.G. § 8D1.4. Such a plan needs to include an outside independent Third Party Auditor (TPA) and Court Appointed Monitor (CAM) funded by the defendant but responsible directly to the Court and Office of Probation.

work an *unwarranted* sentencing disparity. The fact that the defendants have requesting a much lesser sentence with less supervision than defendants that have pleaded guilty and accepted responsibility strains credulity and demonstrates these defendants still don't get it.

As explained by Mr. Dolan, a one year period of probation would not afford the Court sufficient time to put a plan in place let alone evaluate and verify needed change.

> [S]elf-monitoring would not provide adequate assurance against future violations by these defendants. It usually takes at least three years to make the type of changes and have the type of monitoring necessary to achieve the change of corporate governance that results in compliance. In this case, based on my experience and my knowledge of the underlying prosecution and the matters discussed above, a five year term of probation with independent external audits and a Court Appointed Monitor would be the most appropriate. This would allow sufficient time for the Third Party Auditor and Court Appointed Monitor to fully assess *and verify* the company's commitment to the ECP.

Exhibit A at 9, para 23.  Independent external audits are necessary in this case along with an independent Court Appointed Monitor. As Mr. Dolan concluded:

> A review of the defendants stated plans and the minimal evidence of actions taken do not lead me to believe that they will be able to comply with the law over the long run without a cultural change at the leadership and management levels of the companies. At present, all of the representations are unverified. Further, the changes are unlikely to be successful without sufficient external oversite to encourage change and a rigorous monitoring system reporting to the companies, the Court and the government.

*Id*. at 8, para. 21.

> Given the small size of the fleet, I recommend that each ship be subject to an external audit annually. In light of the problems discussed above, I see a need for there to be at least annual external audits of the shore side office. This would include a review of records and receipts showing that the defendants have properly hired qualified technicians to service the OCM and pressure valves and issued authentic certificates. Of particular importance will be the independence and competence of the Third Party Auditor and Court Appointed Monitor. It is important from my experience for the Court to make clear to these individuals that they are working for the Court and Office of Probation, even if they are being paid by the defendants.

*Id*. at 9, para. 22.

As suggested by Mr. Dolan the government recommends that the period of probation be

five (5) years and not less than four (4) years. Each ship that maintains a Certificate of Financial Responsibility ("COFR") (indicating possible/planned operations in the United States) should be audited underway by the TPA at least once annually. Further, there should be at least annual audits of each shore-side audits office by the TPA and CAM. The government submitted a draft ECP for the Court's consideration that contains these requirements.[12]

## **CONCLUSION**

WHEREFORE, and for the reasons stated above, the government requests that this Court impose a sentence on Liquamar and Evridiki that consists of the following:

---

[12] Mr. Dolan recommended several essential steps to determine the extent of defendants' problems with a view toward developing solutions:

    A. There needs to be a comprehensive and thorough investigation of the making and use of fake certificates. Those involved in and knowledgeable of the making and use of false certificates need to be identified, disciplined and/or terminated. Equally important is that there needs to be a root cause analysis of why Liquimar created fake certificates and why they were used.

    B. There needs to be an investigation of whether fake certificates have been made or used on other ships in the Liquimar fleet. Prompt action needs to be taken if it is determined that any of the ships are currently using fake certificates, to include notifying the flag state and classification society.

    C. There needs to be a thorough investigation of whether other ships in the fleet engaged in conduct similar to that which took place on the Evridiki. Concerning the discharges and falsification of the ORB, this could be undertaken, at least in part, by examining historical OCM data. Such a review would also have bearing on determining the legitimacy of the OCM certificates.

    D. There needs to be an investigation and root cause analysis of the apparent effort by the prior DPA to bribe a SIRE inspector as related in Agent Frith's declaration. Liquimar needs to develop and implement an anti-corruption policy.

Exhibit A. The government fully agrees that these are important inquiries for defendants to take for action.  In the event that defendants continue to refuse to undertake these efforts, then banning would be an appropriate alternative.

Criminal Fine:       $2 million per defendant ($4 million total)

Probation:           60 months

Special Conditions:  To include the government proposed ECP


Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division


BY:          /s/ Richard A. Udell
             Richard A. Udell
             Senior Litigation Counsel
             Environmental Crimes Section
             Environment and Natural Resources Division

             /s/ Kenneth E. Nelson
             Kenneth E. Nelson
             Senior Trial Attorney
             Environmental Crimes Section
             Environment and Natural Resources Division